In re Jill Johnson PENNINGTON

and

In re N. Frank Wiggins, Respondents.

Members of the Bar of the District of Columbia Court of Appeals Bar Registration (Bar Registration Nos. 362592 & 194076).

Nos. 05–BG–681, 06–BG–891.

District of Columbia Court of Appeals.

Argued April 2, 2007.

Decided April 26, 2007.

Jill Johnson Pennington, pro se.

N. Frank Wiggins, pro se, with whom John C. Maginnis, III, Washington, DC, was on the brief.

Julia L. Porter, with whom Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, were on the brief, for the Office of Bar Counsel.

Nancy C. Crisman, filed a statement in lieu of brief on behalf of the Board on Professional Responsibility.

Before WASHINGTON, Chief Judge, and FARRELL and KRAMER, Associate Judges.

FARRELL, Associate Judge:

Before us are consolidated recommendations of the Board on Professional Responsibility, one to impose reciprocal discipline on attorney Jill J. Pennington in the form of suspension for thirty days, the other to impose original discipline on attorney N. Frank Wiggins in the form of a suspension for sixty days, thirty days of which would be stayed in favor of unsupervised probation for one year, during which he would be expected to complete a CLE course in legal ethics. Wiggins contests the Hearing Committee's finding of misconduct, accepted by the Board; Pennington does not dispute the Maryland Court of Appeals' findings of misconduct, but defends the Board's recommendation of a thirty-day suspension rather than disbarment, which that court ordered. Bar Counsel disagrees with both sanctions recommended by the Board.

We accept the Board's conclusions regarding Wiggins' misconduct and its recommended sanction as within the range of discipline in this jurisdiction for comparable behavior. We reject the Board's recommendation of a thirty-day suspension for Pennington, and order her to be suspended from the practice of law in this jurisdiction for two years, with the requirement that she prove rehabilitation in order to be reinstated. Although we agree with the Board, for reasons to be stated, that this jurisdiction would impose "substantially different discipline," D.C. Bar Rule XI, § 11(c)(4), for the misconduct Maryland found to require disbarment of Pennington, the Board's recommendation is much too lenient in light of the nature of the misconduct found by our sister court, to whose finding in that regard we must defer.

## I. The Facts

The actions of Pennington and Wiggins at issue concern the same basic events as

described by the disciplinary judge in Maryland, whose findings were adopted by the Court of Appeals in the Pennington matter and do not differ materially from the Hearing Committee's findings in the Wiggins matter. We set forth the facts, with minor editing, as summarized in the Maryland proceedings:[1]

On September 15, 1999, Denise Haynes–Butler ... was involved in a *motor vehicle accident with Mr. James Tidd.* ... Mrs. Butler sustained injuries as a consequence of the motor vehicle accident. On September 20, 1999, Mrs. Butler and her husband, Gary Butler ... retained [Ms. Pennington] to pursue their claims against Mr. Tidd arising from the motor vehicle accident.

A written Retainer Agreement was signed by Mr. and Mrs. Butler on September 20, 1999, providing for [Ms. Pennington] to receive a contingent legal fee of one-third (1/3) of the total recovery obtained by way of settlement or forty percent (40%) of the total recovery obtained by settlement or judgment after suit was filed as payment for her legal services on their behalf.

Mr. Tidd was insured by Amica Mutual Insurance Company.... Nationwide Insurance Company insured Mr. and Mrs. Butler. After consultation, the Butlers informed [Ms. Pennington] that they would agree to a sum of not less than ten thousand dollars ($10,000.00) to fully settle their claims against Mr. Tidd and Amica. [Ms. Pennington], on behalf of the Butlers, and Amica discussed settlement of the claims. [Ms. Pennington] demanded over $20,000.00 for settlement of the Butlers' personal injury claim. Amica, in turn, extended a settlement offer of $9,500.00. Unfortunately, [Ms. Pennington] and Amica were unable to reach a settlement....

On August 12, 2002, [Ms. Pennington] filed a Complaint, *Butler v. Tidd* (hereinafter 'Butler Complaint'), in the Circuit Court for Prince George's County against Mr. Tidd for negligence and loss of consortium and Nationwide Insurance Company for uninsured/underinsured motorist and personal injury protection claims on behalf of Mr. and Mrs. Butler. The Butler Complaint was filed two months before the Statute of Limitations tolled. Simultaneously with the submission of the Butler Complaint, [Ms. Pennington] submitted another[, unrelated] Complaint, *Brown v. Austin* (hereinafter 'Brown Complaint'), in the Circuit Court for Prince George's County Maryland. Although the captions on these two Complaints were different, the Clerk's Office mistakenly assigned the two Complaints the same case number–CAL02–19945. The Brown Complaint was the only Complaint that the Clerk's Office showed a record for having been properly filed and docketed.

[Ms. Pennington] did not recognize the mistake made by the Clerk's Office until on or about October 28, 2002, when she received a letter from ... an adjuster with Amica, acknowledging receipt of the Butler Complaint and requesting verification of the date on which the *summons and Complaint was filed in the Butler case.* The letter also advised [Ms. Pennington] that the case number provided did not correspond with the plaintiffs and defendants in the Butler Complaint.

[Ms. Pennington] acknowledges that two checks were issued by her office in the amount of $100 on August 12, 2002:

---

1. *See Attorney Grievance Comm'n of Maryland v. Pennington,* 387 Md. 565, 876 A.2d 642, 644–47 (2005). Maryland instituted disciplin- ary proceedings against Pennington only, as Wiggins is not a member of that state's bar.

one check, Check No. 1413, drawn from her escrow account for the filing of the Brown Complaint and another check, Check No. 1910, drawn from her operating account for the filing of the Butler Complaint. Check No. 1413 was negotiated by the Prince George's County Circuit County Clerk's Office on August 15, 2002. [Ms. Pennington] received a returned copy of Check No. 1413 with her August 2002 bank statement. Check No. 1910, which was written for the filing fees associated with the Butler Complaint, was never negotiated by the Clerk's Office.

Upon learning of this error ... [Ms. Pennington] contacted the Clerk's Office to determine what actions would be necessary to correct the error. [She] was advised by the Clerk's Office that she needed to submit the file stamped copy of the Butler Complaint and the cancelled check for the filing fee. It was at this time that [Ms. Pennington] became aware that Check No. 1910 was never negotiated. The Statute of Limitations had expired on the Butlers' claim at that time.

On November 9, 2002, [Ms. Pennington] sent a letter to the attorney for Amica ... indicating that the Statute of Limitations had passed on the Butlers' claim before the error was brought to her attention and that he could "close [his] file on this claim." Thereafter, [Ms. Pennington] agreed to sign and present to the court a joint Line of Dismissal With Prejudice in the Butler case. This line of dismissal was filed on January 9, 2003.

[Ms. Pennington] did not advise Mr. or Mrs. Butler of the error that occurred with the filing of their Complaint. [She] did not advise Mr. or Mrs. Butler that their case was dismissed with prejudice and that the Statute of Limitations now barred their claim. Furthermore,

[she] did not consult with either Mr. or Mrs. Butler regarding the dismissal of their Complaint with prejudice nor did she receive their consent to dismiss their claim.

[Ms. Pennington] then decided that she would not disclose the dismissal of the claim to her clients, the Butlers. Rather she would attempt to make them whole by paying them what she thought would placate them and what she perceived to be fair to them, i.e., the sum of $10,000.00 out of her own personal funds. It was also at this time that [she] sought the legal and ethical advice of N. Frank Wiggins, Esquire. . . .

Mr. Wiggins, at the time, was a partner at the law firm of Venable, Baetjer, Howard and Civiletti. . . . [Ms. Pennington had] worked for Mr. Wiggins at his previous law firm, Cohn and Marks, for approximately four and one-half years. Over the years, [Ms. Pennington] and Mr. Wiggins have maintained personal contact with one another, often consulting with each other on legal matters. . . .

[Ms. Pennington] advised Mr. Wiggins of the events that transpired and sought his counsel and advice on her plan to pay the Butlers from her own personal funds. Specifically, [she] sought reassurance from Mr. Wiggins that her payment to her clients out of her personal funds and her nondisclosure of the facts would not in any way violate any laws or rules of ethical conduct in Maryland, or otherwise cause any problems for her or the Butlers. After researching the matter, Mr. Wiggins opined incorrectly to [Ms. Pennington] that no disclosure was required.

On February 6, 2003, [Ms. Pennington] met with Mr. and Mrs. Butler. During this meeting, [Ms. Pennington] presented the Butlers a document enti-

tled "Statement of Settlement." [She] did not disclose to the Butlers that the check they would receive would not come from the settlement of their case but, instead, directly from [her] own funds. The "Statement of Settlement" presented to the Butlers was derived from a form that [Ms. Pennington] customarily utilized when she disbursed funds obtained through settlement of claims with third parties for the benefit of her clients. In fact, the Butlers were presented with a similar "Statement of Settlement" in September 29, 1999, relating to their settlement of the property damage claim with Amica.

The "Statement of Settlement" presented to the Butlers on February 6, 2003, although substantially similar to the September 29, 1999 statement, contained two modifications. The lines designating "Insurance Company" and the "Personal Injury Claim" were purposefully omitted by [Ms. Pennington] from the "Statement of Settlement." The Statement indicated that [Ms. Pennington had] earned and received $4,000 in attorney's fees and $41.65 in expenses, and that $1,828.92 was deducted from the "Client's Net Proceeds" for medical expenses and $375 was deducted for "Gary Butler" for his loss of consortium claim, for a balance of $3,753.43 to Mrs. Butler.

After consultation and consent from Mr. and Mrs. Butler, [Ms. Pennington] attempted to reduce Mrs. Butler's medical expenses. On May 9, 2003 and August 14, 2003, [she] sent letters to Metro Orthopedics & Sports Therapy ... requesting a reduction of its invoice because "[u]nder the terms of settlement, offered by the third party, Ms. Butler will receive virtually no compensation for her injuries if the subject invoice is not reduced." In all, Mrs. Butler's outstanding medical bills of $1,828.92 were

reduced by $160 of which 66 2/3% of this amount was paid to the Butlers.

Mrs. Butler testified at the hearing in this case ... that she believed that, based on the "Statement of Settlement," her case was still viable and that her case had settled with Amica and the check she received in the amount of $3,753.43 was originally from Amica. Nevertheless, Mrs. Butler, even after being apprised of the situation, stated she was satisfied with the services [Ms. Pennington] provided and that she would retain her to perform legal services in the future, if needed.

## II. The Pennington Matter

### A. Disbarment by Maryland

On these facts, the Maryland Court of Appeals found that respondent Pennington had committed multiple ethical violations, chief of which were to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation," Maryland Rules of Professional Conduct 8.4(b), and to "engage in conduct that is prejudicial to the administration of justice." *Id.*, Rule 4(d). It was these violations "and the conduct underlying [them]," the court stated, "that lead the Court to conclude that disbarment is the appropriate sanction." *Pennington, supra* note 1, 876 A.2d at 660.

Specifically, the court found that

[r]espondent's "misrepresentation[s]" and "deceitful conduct" in concealing the true account of how she mishandled the Butlers' claims, falsifying a supposed settlement of those claims with the insurer, intentionally misrepresenting matters in negotiations with third-party health care providers to reduce their charges to the Butlers, and concealing from the Butlers the facts that might have supported lodging a professional negligence claim against respondent, im-

plicate the core responsibilities of truth and honesty expected of attorneys.

*Id.* Although Pennington had consulted Wiggins for advice in the matter, "given her deceitful conduct, she could not have believed, in good faith, [that] her conduct was proper." *Id.* at 657. Moreover, the court stated:

> There is absolutely no evidence in this record ... that respondent advised Mr. Wiggins that she intended to present a "statement of settlement" form to the clients. As the hearing judge found, this form, similar to the one respondent used with this client in a prior case, clearly created an impression that the case was settled. This misrepresentation to the client is at the heart of respondent's misconduct, and there is no evidence that Mr. Wiggins approved this conduct.

*Id.* (footnote omitted). The court further found no "evidence of mitigation," such as good intention, "[ ]sufficient to justify a sanction less than disbarment. Respondent's attempt to purchase a plenary indulgence with her own money is more indicative of a selfish plan to conceal than of a praiseworthy desire to 'make the client whole.'" *Id.* at 661.

### B. Discussion

In accordance with D.C. Bar R. XI, § 11(c), the Board "deem[ed Pennington's] violations" of the Maryland ethical rules—primarily Rules 8.4(c) and (d)—"as conclusively established." It nevertheless rejected disbarment as a proper sanction for her misconduct in the District of Columbia, concluding that "[t]he misconduct established warrants substantially different discipline" here. R. XI, § 11(c)(4). Instead, the Board recommended a thirty-day suspension from the practice of law. Essentially two questions, therefore, are presented to us: (1) Did the Board correctly find, by the required clear and convincing evidence, Rule XI, § 11(c), that disbarment is "substantially different discipline" from the sanction that identical conduct by Pennington in this jurisdiction would warrant? And (2), if so, what should the proper discipline be? *See generally In re De Maio,* 893 A.2d 583, 587–89 (D.C.2006).

### 1.

■ We agree with the Board that Pennington's misconduct would not warrant disbarment in this jurisdiction absent additional circumstances of aggravation not demonstrated. The Board recognized, correctly, that Pennington's disbarment by Maryland was dictated by what amounts to a presumption under Maryland law that an attorney who engages in intentional dishonesty will be disbarred. The *Pennington* court cited, and relied on, its previous decision in *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 773 A.2d 463 (2001). Although that case had involved "the intentional financial misrepresentation genre of conduct violative of Rule 8.4(c)," the *Pennington* court considered it to be

> a seminal case, in that it sought to return some measure of consistency to the analysis of sanctions in intentional dishonesty cases. After documenting the tortured and sometimes inexplicable "all-over-the-ballpark" array of sanctions in cases of attorney dishonesty that preceded it, *Vanderlinde* endeavored to restore a principal, guiding star for the sanctions in such cases: "Disbarment ordinarily should be the sanction for intentional dishonest conduct."

876 A.2d at 661 (quoting *Vanderlinde,* 773 A.2d at 471–85, 488).

*Pennington's* application of the rule that "[d]isbarment ordinarily should be the sanction for intentional dishonest conduct" demonstrates an important difference between Maryland's treatment of intentional

dishonesty—of no matter what kind—and this court's treatment of dishonesty. The distinction is made apparent by the *Vanderlinde* court's discussion of how mitigating or extenuating circumstances will be considered:

> [I]n cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the [Maryland Rules]. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

*Vanderlinde*, 773 A.2d at 485 (emphasis in original). Under this court's precedents, by contrast, a presumption of disbarment rebuttable only by "compelling extenuating circumstances" has heretofore been reserved for one class of intentionally dishonest conduct, that involving misappropriation of client funds. *See In re Addams*, 579 A.2d 190 (D.C.1990) (en banc). In *Addams*, we held that "[w]hen a member of the bar is found to have betrayed his high trust by embezzling funds entrusted to him, disbarment should ordinarily follow as a matter of course." *Id.* at 193. Because the "breach of trust" entailed by intentional misappropriation "is so reprehensible, striking at the core of the attorney-client relationship," *id.* at 198–99, we concluded that "[o]nly the most stringent of extenuating circum-

stances would justify a lesser disciplinary sanction such as suspension," *id.* at 193, citing as an example of such "limited" circumstances "chronic alcoholism." *Id.* at 195.

Outside the context of intentional misappropriation, however, we have applied no such "presumption" of disbarment as the appropriate sanction rebuttable only by "extraordinary circumstances." *Id.* at 191. Demonstrating that fact is that Bar Counsel cited to the Board, and has cited to us, only two cases in which the court has ordered disbarment for dishonesty not of the *Addams* kind, and both are dramatically different on their facts from this one. *In re Goffe*, 641 A.2d 458 (D.C.1994), concerned misconduct by a lawyer "distinguish[able] ... from any that we [had] previously seen," in that he had "repeatedly resort[ed] not only to false testimony but to the actual manufacture and use of false documentary evidence in official matters." *Id.* at 464. Specifically, he had "manufactured evidence for use before the IRS, lied under oath to the Tax Court, and continued to lie about his actions to the Hearing Committee." *Id.* at 465. Comparable to that behavior was the misconduct of the attorney in *In re Corizzi*, 803 A.2d 438 (D.C.2002), who "[w]hile engaged in the practice of law ... blatantly solicited outright perjury by two of his clients on separate occasions"—conduct that, had it led to his criminal conviction, as it could have, "would surely be for a perjury-related offense involving moral turpitude," hence requiring automatic disbarment. *Id.* at 442 (citing *inter alia* D.C.Code § 11–2503(a)). *Goffe* and *Corizzi* thus each involved misconduct criminal or quasi-criminal in nature that "reflect[ed] a continuing and pervasive indifference to the obligations of honesty in the judicial system." *Id.* at 443. However Pennington's actions of deceiving her clients and

falsifying a supposed settlement of claims may be characterized, they are far removed from the unexampled patterns of morally reprehensible behavior that caused both *Goffe* and *Corizzi* to be disbarred.

Sound reasons can no doubt be offered for making all forms of intentional dishonesty presumptively sanctionable by disbarment, as Maryland has done. *See Vanderlinde,* 773 A.2d at 488 ("Honesty and dishonesty [simply] are, or are not, present in an attorney's character."); *Attorney Grievance Comm'n v. Angst,* 369 Md. 404, 800 A.2d 747, 757 (2002) (referring to the "unparalleled importance of honesty in the practice of law"). But the state of disciplinary law in this jurisdiction does not reach that far, and the difference, in our view, justifies the Board's conclusion that Pennington's conduct—which involved dishonesty neither of the *Addams* variety nor of the flagrant kind instanced in *Goffe* and *Corizzi*—warrants significantly lesser discipline in this jurisdiction than the ultimate sanction of disbarment.

### 2.

■ We part company with the Board, however, in its recommendation that Pennington be suspended for thirty days. That proposal rests, first of all, on an impermissible relitigation by the Board—without benefit of the testimony heard and weighed by the Maryland court—of factual issues resolved against Pennington in the original proceeding. More basically, the Board in effect recharacterized, and in so doing seriously minimized, the misconduct found by Maryland in a manner that cannot be reconciled with Rule XI, § 11(c).[2]

■ In keeping with the deference that underlies reciprocal discipline, *see In re Velasquez,* 507 A.2d 145, 147 (D.C.1986), a respondent-attorney may not "seek[ ] to litigate anew issues he raised and lost" before the disciplinary court of another jurisdiction. *In re Meaden,* 902 A.2d 802, 810 (D.C.2006). In important respects, the Board has allowed Pennington to do just that. As Bar Counsel points out, for example, the Board relied on its perception that her misconduct "threatened no one with significant, tangible harm, except the attorney herself, [and] almost certainly worked to the Butlers' financial benefit." Yet the Maryland disciplinary judge found, and the Court of Appeals agreed, that the Butlers were indeed injured and that Pennington benefited economically from her misconduct:

> The Respondent argues that a conflict [of interest] occurs when an event [that] is economically detrimental to a client is economically beneficial to the lawyer. That is correct and this case provides an illustration of such a situation. The Butlers were injured because their lawyer never provided them the information necessary to determine if they wanted to accept a settlement offer from the Respondent or pursue their claim against her through a legal malpractice action. The Respondent was benefited economically because she avoided the costs and expenses of defending a possible malpractice claim that was available to the Butlers.

*Pennington,* 876 A.2d at 650–51. In the same vein, the Board reasoned that "[a] malpractice action was hardly a more advantageous alternative for [the clients]"

**2.** Rule XI, § 11(c) states that, "[u]nless there is a finding by the Board under [provisions of that section inapplicable here] ..., a final determination by a disciplinary court outside the District of Columbia ... that an attorney has been guilty of professional misconduct shall conclusively establish the misconduct for the purpose of a reciprocal disciplinary proceeding."

than receiving the approximately $4,000 that Pennington determined to pay them. But the Maryland court found that the sum Pennington paid to "placate" the Butlers in furtherance of her plan "cannot represent the amount that would have been recovered in a malpractice claim," *id.* at 651, and that "the Butlers' willingness to settle for $10,000 is not determinative of the value of their claims." *Id.* at 657. Most significantly, perhaps, where the Board saw Pennington's dishonesty as "motivated by [her] desire to benefit her client at the attorney's own expense," the Maryland court found that her "attempt to purchase a plenary indulgence with her own money is more indicative of a selfish plan to conceal than a praiseworthy desire to 'make the clients whole.'" *Id.* at 661.[3]

Fundamentally, moreover, we think that the Board re-characterized Pennington's misconduct in a manner forbidden by Rule XI, § 11(c). *See, e.g., In re Berger,* 737 A.2d 1033, 1041 (D.C.1999) (whereas New Jersey disciplinary board "analogized Berger's misconduct to cases involving mail and insurance fraud," the Board impermissibly "re-characterized [it] as involving false swearing, and recommended a downward departure"). In a telling statement, the Board said that Pennington's misconduct, "while violating her professional obligations *of keeping her client[s] fully informed* and *permitting them to decide the important choices in their legal matters,* actually appears to have worked ... to [their] economic advantage" (emphasis added). Maryland, however, did not regard Pennington's conduct as only, or primarily, the *failure* to keep her clients informed, *see* Maryland Rules of Professional Conduct 1.4 ("Communication"), or *failure* to reserve important choices to their decision. It found her conduct to be affirmative "deceit[ ]," as she "conceal[ed] the true account of how she mishandled the Butler's claims, falsif[ied] a supposed settlement of those claims with the insurer, intentionally misrepresent[ed] matters in negotiations with third-party health care providers, and conceal[ed] from the Butlers the facts that might have supported lodging a professional negligence claim against respondent." *Pennington,* 876 A.2d at 660. Given these actions, we cannot help concluding that the recommended thirty-day suspension by the Board reflects disagreement with the very nature of the misconduct found by Maryland—a disagreement that was beyond its authority in this reciprocal matter. *See, e.g., In re Spann,* 711 A.2d 1262, 1263 (D.C.1998) (Board's assessment of conduct in reciprocal case rejected because it did not reflect "the full extent of [attorney's] misconduct" as found by other jurisdiction).

■ We therefore reject the Board's recommendation as disproportionate to the gravity of misconduct which Maryland found to "implicate the core responsibilities of truth and honesty expected of attorneys." *Pennington,* 876 A.2d at 660. Instead, cases such as *In re Foshee,* 897 A.2d 203 (D.C.2006) (reciprocal three-year suspension; attorney dismissed action he had filed, failed to reinstate it, and "instead of telling [client] he had dismissed it, told her she could not win and there was nothing more he could do"), and *In re Sheehy,* 454

---

3. The Maryland court also found that Pennington had "not express[ed] remorse for her deceitful actions," 876 A.2d at 661, a fact unmentioned by the Board; and Maryland was unimpressed by—and so disregarded—the clients' after-the-fact forgiveness of her concealment and their willingness to retain her again, a fact the Board found significant. Finally, the Maryland court noted that Pennington had been disciplined once before, *see Attorney Grievance Comm'n of Maryland v. Pennington,* 355 Md. 61, 733 A.2d 1029 (1999), again a fact the Board did not mention.

A.2d 1360 (D.C.1983) (en banc) (original two-year suspension plus fitness requirement; attorney neglected client's matter and later paid him with attorney's own funds without disclosing true status of case and fact that no settlement offer had been received), persuade us that Pennington should be suspended in the District of Columbia for a period of two years, with the requirement that she show fitness as a condition of reinstatement. Any lesser sanction, we believe, would convert this reciprocal proceeding into the "near-equivalent of a de novo review," *In re Spann,* 711 A.2d at 1265, of Maryland's determination of misconduct.

### III. The Wiggins Matter

■ In this original discipline proceeding, the Board accepted the findings and conclusions of law of the Hearing Committee, which had had "no trouble finding that Bar Counsel has sustained his burden of proving ... by clear and convincing evidence" that Wiggins, among other misconduct, had knowingly assisted or induced Pennington to violate Maryland's ethical rules, *see* District of Columbia Rules of Professional Conduct 8.4(a), and through that assistance had committed dishonesty, fraud, deceit or misrepresentation. *Id.,* Rule 8.4(c). We in turn accept the Board's conclusions of misconduct.

In his brief to the court, Wiggins concedes that Pennington's "proposed course of conduct was fraudulent and that he knew it to be so" (Br. for Respondent at 4). He argues, nevertheless, that Bar Counsel failed to prove that he "counseled Mr. Pennington to engage in the conduct, rather than giving her *advice about the*

*legal consequences of* engaging in the conduct proposed" (*id.*; emphasis added); *see also id.* at 5 ("Mr. Wiggins did nothing more than to offer legal advice to Ms. Pennington of the legal consequences of a proposed course of action."). But, as the Committee recognized, the flaw in this argument is that Wiggins did not inform Pennington of what he concedes that he knew—that the proposed deception of the clients was fraudulent. Instead, in the Committee's words, he "advis[ed her] that the intended deception of her clients was ethically permissible" when he knew, and certainly should have known, that her "breach of her ethical responsibilities was an obvious one." In other words, as the Committee found, Pennington turned to Wiggins seeking "ratification, from an uninformed, but friendly, source, of [a dishonest] course of conduct already selected" (quoting *Pennington,* 876 A.2d at 661), and Wiggins "provid[ed] the desired 'ratification,'" thus himself "act[ing] in a manner that evinces 'a lack of honesty, probity or integrity in principle'" (quoting *In re Romansky,* 825 A.2d 311, 315 (D.C.2003)). In sum, the Board's conclusion that Wiggins dishonestly lent his advice and approval to a plan of deception—a plan that had "the natural effect of concealing a potentially valuable malpractice claim from the Butlers"—is amply supported by the record.[4]

■ We further accept the Board's recommended sanction, although the matter is not free of difficulty. Bar Counsel argues that a sixty-day suspension (with thirty days stayed in favor of probation and mere completion of a CLE course) is too lenient in light of the gravity of Pennington's misconduct concurred in and counseled by Wiggins. But just as reciprocal discipline

---

**4.** It scarcely requires noting that the Hearing Committee's rejection of the notion that "the malpractice claim could have had no value beyond the amount paid to the Butlers by Ms. Pennington," adopted by the Board in the Wiggins matter, cannot be squared with the Board's conclusion in the Pennington case that no one, "except [Pennington] herself, suffered financial harm as a result of [her] scheme."

presumptively requires deference to the judgment of the other court, so in original proceedings we defer to the Board's recommended sanction unless it is unwarranted or inconsistent with our dispositions for comparable conduct. D.C. Bar Rule XI, § 9(g). The Hearing Committee, in a careful analysis which the Board essentially adopted, arrayed our past decisions that impose a fairly broad range of suspension for analogous conduct entailing dishonesty. The Committee noted, for example, that unlike the attorney in *In re Hager*, 812 A.2d 904 (D.C.2002) (one-year suspension where lawyer accepted monetary compensation from adverse party and agreed not to pursue litigation and not to disclose arrangement to clients), "Wiggins had no malicious or venal motive and did not benefit financially from the advice he rendered." Similarly, the Committee found that Wiggins' ratification of a course of action Pennington had "already selected" entailed far less "involvement in the client's dishonest conduct" than did the conduct of the attorney in *In re Sandground*, 542 A.2d 1242 (D.C.1988), who received a ninety-day suspension for actively fashioning and advising the strategy by which a client could conceal assets from discovery in a divorce suit. Equally important, the Committee took note of the fact that in disbarring Pennington the Maryland court had "focused on aspects of Ms. Pennington's conduct—notably, her preparation of the misleading 'Statement of Settlement' for the Butlers—of which there is no evidence [Wiggins] had knowledge." We too are mindful of the Court of Appeals' observation that, in seeking advice from Wiggins, "there is no evidence that [Pennington] fully disclosed to him the proposed misrepresentations and deceit." *Pennington*, 876 A.2d at 661.[5]

For these reasons, we are not convinced that we should reject the Board's proposed sanction in favor of the six-month suspension recommended by Bar Counsel. Wiggins, as the Committee noted, has practiced law in this jurisdiction without prior disciplinary incident for more than thirty years. Suspension for sixty days (partly stayed) is within the range of discipline we have imposed for comparable acts of dishonesty. *See In re Outlaw*, No. 05–BG–1470, 917 A.2d 684, 2007 D.C.App. Lexis 94 (D.C.2007) (discussing cases).

## IV.

Accordingly, respondent Jill Johnson Pennington is hereby suspended from the practice of law in the District of Columbia for two years; she must demonstrate proof of rehabilitation as a condition of reinstatement. *See* D.C. Bar Rule XI, § 16. The suspension is retroactive to September 13, 2005, when Pennington filed the affidavit required by Rule XI, § 14(g). Respondent N. Frank Wiggins is hereby suspended from the practice of law in the District of Columbia for sixty days, thirty of which are stayed in favor of unsupervised probation for one year during which he must complete a CLE course in legal ethics.

*So ordered.*

5. *See also Pennington*, 876 A.2d at 657 (footnote omitted):

There is absolutely no evidence in this record, either from respondent or Mr. Wiggins, that respondent advised Mr. Wiggins that she intended to present a "statement of settlement" form to the clients. As the hearing judge found, this form, similar to the one respondent used with this client in a prior case, clearly created an impression that the case was settled. This misrepresentation to the client is at the heart of respondent's misconduct, and there is no evidence that Mr. Wiggins approved this conduct.