**In re David E. FOX, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 165258).**

No. 10–BG–1630.

District of Columbia Court of Appeals.

Argued Jan. 10, 2013.

Decided May 23, 2013.

David E. Fox, Washington, DC, pro se.

William R. Ross, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Jennifer P. Lyman, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before WASHINGTON, Chief Judge, and FISHER and THOMPSON, Associate Judges.

FISHER, Associate Judge:

In this reciprocal discipline proceeding against respondent David E. Fox, the Board on Professional Responsibility ("Board") recommends that we impose a two-year suspension with conditions. Bar Counsel argues that respondent should receive the identical reciprocal discipline of disbarment. We adopt the Board's recommendation.

## I. Factual and Procedural Background

On December 20, 2010, the Maryland Court of Appeals disbarred respondent from the practice of law. *Attorney Grievance Comm'n of Maryland v. Fox*, 417 Md. 504, 11 A.3d 762 (2010). This sanction was based upon findings by a judge of the Circuit Court for Montgomery County, Maryland, that respondent had violated several Maryland Rules of Professional Conduct in connection with his work on two separate personal injury matters. *Id.* at 766–76. In connection with one matter, his representation of Miller and Pearson, respondent was found to have violated Maryland Rules of Professional Conduct 1.1 (Competence), 1.2 (Scope of Representation), 1.3 (Diligence), 1.4 (Communication), 1.16 (Terminating Representation), and 8.4 (Misconduct). 11 A.3d at 768–70. In the other matter, the representation of Barrie, respondent was found to have violated many of the same rules. *Id.* at 772–74.

For a convenient summary of respondent's misconduct, a portion of the Board's report is included in the following paragraphs.[1] Additional details are available in the opinion of the Maryland Court of Appeals.

A. *Ronnie E. Miller and David A. Pearson*

Respondent undertook the representation of two individuals, Ronnie E. Miller and David A. Pearson, who were involved in an automobile accident. He filed a complaint in March 2004 without obtaining a copy of the accident report and sent the summons to the wrong address for the defendant.[2] Both Mr. Miller and Mr. Pearson notified him that he had the wrong address, but Respondent did not correct the information.

In October 2004, the court sent Respondent a notice stating that the complaint was subject to being dismissed for lack of service. Respondent maintains that he never received the notice, but he never checked with the Court to determine the status of the case. The case was dismissed in December 2004. In 2006, Respondent twice attempted to re-serve the defendant, notwithstanding that the case had been dismissed. However, he never obtained the correct address and service was never effected. In addition to these difficulties, the Circuit Court found that Respondent failed to return his clients' telephone calls. When Mr. Miller finally managed to reach him, Respondent told Mr. Miller

that "We've already been to court," and terminated the call abruptly on the grounds that his voice was sore from having been in court. [*Attorney Grievance Comm'n of Maryland v. Fox*, 417 Md. 504, 11 A.3d 762, 767 (Md.2010)].

Mr. Pearson learned that his case had been dismissed in 2007, after he had retained a new attorney. Mr. Miller learned that the case had been dismissed in 2008, after he too had retained new counsel. When contacted by Mr. Pearson's new counsel, Respondent told him that he was trying to find the defendant and was waiting for the judge to give him a court date.[3] Subsequently, when asked by Mr. Miller to attempt to have the dismissal set aside, Respondent refused to act on the grounds that Mr. Miller had retained new counsel. The Circuit Court found that, due to Respondent's delays, the "possibilities of reviving the case, or recovering damages for Miller and Pearson, are now seemingly lost forever as a result of Respondent's lack of attention and care to this matter." *Id.* at 768.

The Circuit Court held, *inter alia*, that Respondent had done "nothing to pursue the case of his clients," "failed to diligently carry out the case that he had initiated," "failed to keep himself reasonably informed about" its status, "failed to keep his clients properly informed" and "engaged in misrepresentation when he told Miller, 'We've already been to

---

1. The bracketed numbers of the footnotes in the following portion of the Board report have been changed to conform to the sequence of footnotes in this opinion.

2. He also confused Mr. Miller and Mr. Pearson, alleging that Mr. Miller was the driver and Mr. Pearson was the passenger, when the opposite was the case. *Fox*, 11 A.3d at 767.

3. Respondent maintains here that it was difficult to find the defendant because she mar-

ried, changed her name and moved to a military base.... However, it is not clear what steps Respondent actually took to find her, other than requesting a reissuance of the summons for the defendant on two separate occasions. *Fox*, 11 A.3d at 770. Obviously, the Circuit Court found that whatever Respondent had done, if anything, was insufficient as it concluded that he had abandoned the case entirely. *Id.* at 769–70.

court.' " [4] *Id.* at 768–70. It concluded that he had violated Maryland Rules 1.1 (competence); 1.2 (failure to abide by client's decisions as to objectives); 1.3 (diligence); 1.4 (failure to communicate); 1.16 (failure to protect client interests on termination); 8.4(a) (violating Maryland Rules of Professional Conduct); and 8.4(c) (misrepresentation).

### B. *Abdul M. Barrie*

In the second case, Respondent was retained by Mr. Abdul M. Barrie who was injured in an automobile accident. Since the driver of the vehicle that struck Mr. Barrie was uninsured, Respondent filed an uninsured motorist claim against Mr. Barrie's carrier, GEICO. In January 2002, GEICO sent Respondent five checks totaling $2,506.30 to cover Mr. Barrie's medical expenses—PIP payments. When GEICO advised Respondent that Mr. Barrie had exhausted his PIP payments, Respondent notified GEICO that he had not received the checks. The checks were never negotiated. GEICO reissued these five checks six times from August 2002 through February 2006, in addition to four checks issued in October 2006 and five more in May 2007. None of those checks were ever negotiated, either. In May 2003, GEICO issued a check in the amount of $5,825 in settlement of the uninsured motorist claim. Respondent never obtained Mr. Barrie's consent to the settlement and, indeed, he never told Mr. Barrie about it. That check was also never negotiated. The Circuit Court found that none of the approximately 50 checks that GEICO issued and sent to Respondent was ever negotiated.

Respondent was unable to explain what happened to the GEICO checks. His system for keeping records as to the status of cases and the receipt of funds was crude and failed in this instance. While he testified that he thought his mail was being stolen, he never took any steps to obtain a P.O. Box or otherwise assure that he received his mail.

Mr. Barrie learned of the settlement when he retained new counsel in 2008 after he was sued by a medical provider for non-payment of medical bills incurred as a result of the accident. In July 2008, nearly six years after the initial checks were issued, GEICO sent Mr. Barrie's new counsel new checks for the PIP payments and the settlement. Mr. Barrie's new counsel gave them to Mr. Barrie.

Mr. Barrie testified that he had difficulty in reaching Respondent, that his telephone calls often were not returned and that when he went to Respondent's office, he was told that Respondent was not available. Respondent also did not return Mr. Barrie's new counsel's telephone calls or correspondence.

In May 2008, Maryland Bar Counsel commenced an investigation of Respondent in response to Mr. Barrie's complaint. Respondent delayed responding to Bar Counsel's request for a response to Mr. Barrie's complaint and was, in general, uncooperative. For example, Respondent told Bar Counsel's investigator that Mr. Barrie's file was in storage and "that it was too hot for Respondent to get the file, because there was no air conditioning at the storage location." *Id.* at 772. He subsequently advised Bar Counsel that the file was actually in his office, but that the office had

---

4. The Circuit Court did not make any finding with respect to Respondent's statement to Mr. Pearson's new attorney that the case was awaiting a court date. *See Fox,* 11 A.3d at 770.

flooded and he needed more time. Approximately six weeks after promising to produce the file, Respondent finally mailed a copy to Bar Counsel.

The Circuit Court concluded that Respondent had "abandoned Barrie and his case by failing to follow up on whether the PIP and settlement checks" had been sent; by not communicating adequately with Mr. Barrie; by "fail[ing] to adequately consult with Barrie about the settlement"; and that he "was uncooperative with the Office of Bar Counsel." *Id.* It held that he violated Rules 1.1 (competence); 1.2(a) (failure to abide by client decisions regarding settlement agreements); 1.3 (diligence); 1.4 (failure to communicate); 1.16 (failure to protect client interests on termination); 8.1(b) (failure to respond to Bar Counsel's requests); 8.4(a) (violating Maryland Rules of Professional Conduct); and 8.4(d) (conduct prejudicial to the administration of justice).

C. *Mitigation Findings*

On remand from the Court of Appeals to address Respondent's mitigation claims, the Circuit Court rejected all but one. It found that he was not remorseful as he had not taken any corrective actions and maintained throughout the hearing that he had not violated any rules; that his health problems did not extend over the period of years covered by these matters and thus did not excuse his misconduct; that the flooding of his office did not mitigate his failure to cooperate with Bar Counsel and that his dealings with Bar Counsel "demonstrated the same careless attitude that Respondent showed towards the cases of Miller, Pearson, and Barrie." *Id.* at

774–76. The Circuit Court did give him credit for updating his manual calendar and case tracking system to a computerized system, but held that effort insufficient to warrant mitigation.

On appeal, the Maryland Court rejected each of Respondent's exceptions to the Circuit Court's findings of fact and conclusions of law, including the Circuit Court's mitigation conclusions. *Id.* at 776–84. The Court of Appeals held that, under its decision in *Attorney Grievance Comm'n v. Kwarteng*, 411 Md. 625 [652], 984 A.2d 865 (2009), Respondent's neglect to the point of abandonment, misrepresentation, and failure to cooperate with Bar Counsel warranted disbarment. *Fox*, 11 A.3d at 785.

District of Columbia Court of Appeals Board on Professional Responsibility Report at pp. 4–8 (May 8, 2012).

After the District of Columbia's Bar Counsel notified us of the foreign discipline, we suspended respondent from the practice of law pending the resolution of this reciprocal discipline proceeding, and ordered him to show cause why he should not be disbarred in the District of Columbia. Respondent filed a timely response, contending that identical reciprocal discipline was not appropriate because the Maryland sanction of disbarment is substantially different from the sanction that would be imposed in the District for the same misconduct. *See* D.C. Bar R. XI, § 11(c)(4).

Thereafter, we referred this matter to the Board, *see* D.C. Bar Rule XI, § 11(e), which recommended that we impose different reciprocal discipline of a two-year suspension.[5] Bar Counsel objected to the

---

**5.** The Board recommended "that Respondent be suspended for two years, with the last year stayed in favor of Respondent being placed on probation with a practice monitor for a peri-

od of eighteen months." In addition, the Board recommended that, "[s]hould Respondent violate the terms of his probation, the remaining one-year suspension would be im-

Board's recommendation, asserting that none of the exceptions to reciprocal discipline applies and that disbarment is warranted.

## II. Analysis

■■■ "In attorney-discipline cases arising as reciprocal matters, D.C. Bar R. XI § 11(c) sets forth a rebuttable presumption in favor of this court's imposition of discipline identical to the discipline imposed by the original disciplining jurisdiction. The presumption applies unless the party opposing discipline (or urging non-identical discipline) shows, by clear and convincing evidence, that an exception should be made on the basis of one or more of the grounds set out in Rule XI, § 11(c)(1)-(5)." *In re Salo*, 48 A.3d 174, 178 (D.C.2012) (citation, footnote, and internal quotation marks omitted).[6] "Determining whether one or more of the exceptions applies 'is a question of law or ultimate fact,' and therefore the court's review is *de novo*." *In re Carithers*, 54 A.3d 1182, 1185 (D.C.2012) (quoting *Salo*, 48 A.3d at 178); *accord, In re Gallagher*, 886 A.2d 64, 68 (D.C.2005).

Respondent now argues that identical reciprocal discipline is not appropriate because exceptions (3), (4), and (5) of D.C. Bar R. XI, § 11(c) apply. We agree with the Board's conclusion that respondent has not carried his burden under exceptions (3) and (5). However, the Board rejected disbarment, finding that "the Maryland

sanction is substantially different than the discipline that would be imposed in the District of Columbia." *See* D.C. Bar R. XI, § 11(c)(4).

■■■ To determine whether the "substantially different discipline" exception applies, we undertake a two-step inquiry: "First, we determine if the misconduct in question would not have resulted in the same punishment here as it did in the disciplining jurisdiction.... Second, where the discipline imposed in this jurisdiction would be different from that of the disciplining court, we must then determine whether the difference is substantial." *In re Garner*, 576 A.2d 1356, 1357 (D.C.1990) (citation omitted). We have defined "same punishment" as a sanction "within the range of sanctions that would be imposed for the same misconduct." *Id.*

While we agree with Bar Counsel that this "is not a run-of-the-mill neglect case," we also agree with the Board that respondent's conduct does not present this court with the "extenuating or aggravating factors" we typically require for imposing the sanction of disbarment in a case which does not involve misappropriation. *See In re Guberman*, 978 A.2d 200, 210 n. 13 (D.C.2009) ("[A] continuing and pervasive indifference to the obligations of honesty in the judicial system warrants disbarment while less egregious conduct does not.") (internal quotation marks omitted); *see also In re Pelkey*, 962 A.2d 268, 281–82 (D.C.2008) (disbarment warranted where

posed and reinstatement to the Bar would be conditioned on his demonstrating his fitness to practice law."

6. D.C. Bar R. XI, § 11(c) provides, in part, that "[r]eciprocal discipline shall be imposed unless the attorney demonstrates, by clear and convincing evidence, that: (1) The procedure elsewhere was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or (2) There was such infirmity of proof establishing the mis-

conduct as to give rise to the clear conviction that the Court could not, consistently with its duty, accept as final the conclusion on that subject; or (3) The imposition of the same discipline by the Court would result in grave injustice; or (4) The misconduct established warrants substantially different discipline in the District of Columbia; or (5) The misconduct elsewhere does not constitute misconduct in the District of Columbia."

attorney committed "persistent, protracted, and extremely serious and flagrant acts of dishonesty," among other misconduct); *In re Pennington*, 921 A.2d 135, 140–42 (D.C.2007) (reciprocal discipline of disbarment was not warranted where attorney's "actions of deceiving her clients and falsifying a supposed settlement of claims" did not "involve[ ] misconduct criminal or quasi-criminal in nature that 'reflect[s] a continuing and pervasive indifference to the obligations of honesty in the judicial system'" that has led to disbarment in other cases) (quoting *In re Corizzi*, 803 A.2d 438, 443 (D.C.2002)).

Rather, in original discipline cases involving misconduct most analogous to respondent's, this court has consistently suspended the offending attorney. *See In re Samad*, 51 A.3d 486, 500–01 (D.C.2012) (three-year suspension, fitness requirement, and restitution to one client as a condition of reinstatement imposed on attorney whose misconduct, while more extensive than respondent's ("40 violations of 14 Rules in six matters"), involved violations of many of the same rules, including Rules 1.1, 1.3, 1.4, 1.16, and 8.4); *see also In re Carter*, 11 A.3d 1219, 1221, 1223–24 (D.C.2011) (eighteen-month suspension with a fitness requirement imposed where

attorney violated many of the same rules as respondent in connection with his work on three matters); *In re Kline*, 11 A.3d 261, 262–63 (D.C.2011) (attorney suspended for a period of three years for, among other misconduct, "fail[ing] to make crucial litigation filings," "negotiat[ing] settlement terms with the adverse parties" without authorization of client, and forging client's signature on settlement agreement); *In re Steele*, 868 A.2d 146, 147, 152–54 (D.C. 2005) (attorney suspended for a period of three years "in addition to a requirement of a showing of fitness for reinstatement and payment of restitution" for "a continuous pattern of misconduct [including intentional neglect and dishonesty] spanning several years and five clients");[7] *In re Sheehy*, 454 A.2d 1360, 1361 (D.C.1983) (en banc) (two-year suspension imposed where attorney "neglect[ed] the legal matter entrusted to him by his client ... and ma[de] serious misrepresentations to both his client and Bar Counsel"); *In re Smith*, 403 A.2d 296, 303 (D.C.1979) (attorney suspended for eighteen months where he "acted with 'callous disregard' for the interests of his clients as evidenced by his acts of fraud, abandonment, and neglect").[8]

Our review of the relevant case law demonstrates that respondent's conduct

**7.** Bar Counsel interprets *Steele* as supporting his argument for disbarment in light of our observation in that case that both Bar Counsel's recommendation of disbarment and the Board's recommendation of suspension for a period of three years were "well founded." 868 A.2d at 147. We disagree with Bar Counsel's gloss on *Steele*. In *Steele*, we recognized "a pattern of aggravated neglect of several clients" that "caused a range of harm ... including adverse judgments, financial loss, needless uncertainty, and a disrespect for the profession." *Id.* at 154. There also was "unequivocal evidence showing dishonesty by [Steele] in his representations to a judge, other lawyers, and to his clients." *Id.* Nevertheless, we rejected Bar Counsel's recommendation of disbarment. In the present matter,

respondent's misconduct was undoubtedly serious, but we are not prepared to say that it is more deserving of disbarment than the conduct we examined in *Steele*.

**8.** The misconduct at issue in both *Steele* and *Kline* is, under the Board's reading, "much more extensive and serious ... than [that] established here." We agree that the cases are by no means precisely analogous, but also recognize, as we have previously, that "[i]t is difficult, even in the best of circumstances, to try to match the facts of one case with previously decided cases in order to align the sanctions we impose for similar misconduct." *See In re Kitchings*, 857 A.2d 1059, 1060 (D.C. 2004) (per curiam).

would have warranted a different sanction if presented on a petition for original discipline. "We also find the second portion of the test satisfied because it is self-evident that there is a substantial difference between a ... two-year [or three-year or eighteen-month] suspension and disbarment." *In re De Maio*, 893 A.2d 583, 589 (D.C.2006).

▆▆▆ "Because the presumption in favor of identical reciprocal discipline is overcome, we next consider whether to accept the Board's recommendation...." *Guberman*, 978 A.2d at 208. We are not bound to do so, but "we owe respect to the considered judgment of the members of the Board." *Id.* at 210 (internal quotation marks omitted). The previous discussion has demonstrated that a suspension from the practice of law, rather than disbarment, is the norm for similar misconduct.[9] Our case law also supports a suspension of the length recommended by the Board. One issue remains: whether to require respondent to demonstrate his fitness to practice law before he may be reinstated.

▆▆▆ In order for us to impose a fitness requirement, as Bar Counsel urges us to do, "the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *In re Cater*, 887 A.2d 1, 24 (D.C.2005). Thus, Bar Counsel bears the burden of persuasion on this issue. " 'Serious doubt,' we said in *Cater*, is 'real skepticism, not just a lack of certainty.' " *Guberman*, 978 A.2d at 213 (quoting *Cater*, 887 A.2d at 24). "[P]roof of a violation of the Rules that merits even a substantial period of suspension is not necessarily suf-

ficient to justify a fitness requirement[.]" *Cater*, 887 A.2d at 22.

According to the Board, "the record does not establish a pattern of errant or dishonest behavior that raises serious questions as to [respondent's] integrity or character." There may be room for uncertainty about this question, but there clearly is support for the Board's conclusion that respondent's misconduct "relates principally to his organizational skills and ability to keep track of the various cases in his office."

We also agree with the Board that the appointment of a practice monitor provides a thoughtful, targeted response to respondent's "sloppy recordkeeping and a failure to communicate that resulted in his abandonment of his clients' matters." *See In re Boykins*, 999 A.2d 166, 174 (D.C.2010) ("We have used practice monitors 'to help respondents remedy specific practice deficiencies that were at the root of their disciplinary violations.' "). As suggested by the Board, "[t]he monitor will submit quarterly written reports to the Board, with copies to Bar Counsel and Respondent...." The Board may recommend extension or revocation of respondent's probation if inadequate progress has been shown. Moreover, under the Board's recommendation, respondent will be required to demonstrate his fitness to practice law if he does not satisfy the terms of probation.

### III. Conclusion

David E. Fox is hereby suspended from the practice of law in the District of Columbia for a period of two years, with the last year of suspension stayed in favor of probation with a practice monitor for a period of eighteen months. During his

---

9. This would not be the first reciprocal discipline case where Maryland disbarred the respondent but we have concluded that a sanction of suspension was appropriate. *See, e.g.,* *In re Guberman*, 978 A.2d 200 (D.C.2009); *In re Pennington*, 921 A.2d 135 (D.C.2007); *In re De Maio*, 893 A.2d 583 (D.C.2006).

period of probation, respondent must comply with the terms and conditions specified in the Board's Report, including meeting with a practice monitor appointed by the Board. Should respondent violate these terms or conditions, he will be suspended for the remaining year, with reinstatement conditioned on demonstrating his fitness to practice law. For purposes of reinstatement, the suspension shall be deemed to commence from the date respondent files the affidavit required by D.C. Bar R. XI, § 14(g).[10]

*It is so ordered.*

10. As Bar Counsel observes in his brief, respondent has failed to file the affidavit required by D.C. Bar R. XI, § 14(g).