**In re Mark S. GUBERMAN, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 442683).**

**No. 06–BG–1058.**

District of Columbia Court of Appeals.

Argued Jan. 15, 2009.

Decided Aug. 13, 2009.

Mark S. Guberman, Manalapan, pro se.

Judith Hetherton, Senior Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before RUIZ and THOMPSON, Associate Judges, and FARRELL, Senior Judge.*

THOMPSON, Associate Judge:

On April 13, 2006, the Court of Appeals of Maryland disbarred Mark S. Guberman, concluding that he engaged in conduct involving dishonesty and misrepresentation in violation of Rule 8.4(c) of the Maryland Rules of Professional Conduct ("MRPC") and in conduct prejudicial to the administration of justice, in violation of MRPC Rule 8.4(d).[1] After Bar Counsel reported the Maryland discipline to this Court, we issued an interim order suspending respondent from practice in this jurisdiction and directing the Board on Professional Responsibility (the "Board") to provide its recommendation as to whether (1) this court should impose identical, greater or lesser discipline as reciprocal discipline, or (2) the Board should commence an origi-

nal-discipline proceeding. In its Report and Recommendation dated November 6, 2007 ("Report"), the Board recommended that we impose non-identical reciprocal discipline-specifically, a suspension of 18 months. We now adopt the Board's recommendation.

## I. Background

### A. Respondent's Misconduct and the Maryland Proceedings

Respondent's misconduct arose in the course of his employment as an associate with a law firm in Rockville, Maryland. Along with other lawyers at the firm, respondent represented a client as plaintiff in two related matters in Virginia state and federal courts. The federal court case was resolved in the client's favor, but the state court suit was summarily dismissed in favor of the defendants. Thereafter, as found by the hearing court in Maryland,

[The client] advised [respondent] Guberman that he did not want to appeal the [state court] case because he did not want to incur additional fees and expenses. Mr. Guberman discussed the matter with Mr. Cooper [respondent's supervisor at the law firm] and Mr. Moore [another lawyer at the firm]. Mr. Cooper instructed Mr. Guberman to tell [the client] that the firm would modify the fee arrangement if he pursued an appeal. Mr. Guberman did not convey that offer to [the client].

When Mr. Cooper later asked him about the status of the case, Mr. Guberman said he had filed a Notice of Appeal in the Circuit Court. In September 2003, Mr. Guberman told Mr. Cooper that he

---

* Judge Farrell was an Associate Judge, Retired, at the time of the argument. His status changed to Senior Judge on January 23, 2009.

1. *See Attorney Grievance Comm'n of Md. v. Guberman*, 392 Md. 131, 896 A.2d 337, 338 (2006). Following this action by the Maryland court, respondent was reciprocally disbarred by the Supreme Court of Pennsylvania on November 7, 2008.

had filed a Petition For Appeal in the Supreme Court of Virginia. Mr. Guberman placed copies of these pleadings in the firm's file. Both copies bore what appeared to be file stamps indicating that the Clerk had received and filed the pleadings.

Mr. Guberman submitted monthly status reports to the firm. The status report dated December 22, 2003, reported that he was "awaiting court's ruling on petition for appeal...." Mr. Cooper made further inquiries about the status of the appeal in early 2004. Around the end of May 2004, at the request of Mr. Cooper, Mr. Cooper's assistant, Jessica Stitely, watched Mr. Guberman call the court to check on the status of the case. Ms. Stitely was informed that the case was still pending.

In July 2004, Mr. Cooper made inquiries with the Virginia courts and learned that the appeal had never been filed and that the filing receipt stamps were not genuine. When confronted by Mr. Cooper, Mr. Guberman acknowledged that he never filed the appeal....

[The client] never authorized Mr. Guberman to file an appeal. He never was told by Mr. Guberman that an appeal had been filed.

*Guberman*, 896 A.2d at 339. The Maryland hearing court concluded that:

Mr. Guberman engaged in conduct involving dishonesty and misrepresentation in violation of Rule 8.4(c) ... by falsely representing to Mr. Cooper and other representatives of the firm that he had filed an appeal in [the client's] case. He engaged in conduct prejudicial to the administration of justice [in violation of

Rule 8.4(d)] by creating falsified filing stamps on papers, falsely certifying that the papers had been filed in court.

*Id.* at 339–40.[2] Respondent did not take exception to those findings of fact and conclusions of law. *Id.* at 340. The Maryland Court of Appeals adopted them and imposed a sanction of disbarment. *Id.* at 340.

### B. Reciprocal Discipline in the District of Columbia

■ This court imposes reciprocal discipline in accordance with the provisions of D.C. Bar R. XI, § 11. Rule XI, section 11 "continues to 'create[ ] a rebuttable presumption' that, when a member of our Bar has been disbarred, suspended, or placed on probation by another disciplining court, the discipline will be the same in the District of Columbia as it was in the original disciplining jurisdiction." *In re Gonzalez*, 967 A.2d 658, 660 (D.C.2009) (explaining that this presumption continues to apply following amendments to the Rule that became effective in August 2008) (citation omitted). Specifically, Rule XI, section 11 provides that this court "shall impose identical discipline unless the attorney demonstrates by clear and convincing evidence, or the Court finds on the face of the record," that one or more of the following grounds exists:

(1) the procedure elsewhere was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or

(2) there was such infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Court could not, consistently with its

---

**2.** MRPC Rule 8.4(c) is identical to Rule 8.4(c) of the District of Columbia Rules of Professional Conduct ("DCRPC"); both prohibit "conduct involving dishonesty, fraud, deceit, or misrepresentation...." MRPC Rule 8.4(d), which prohibits "conduct prejudicial to the administration of justice," is substantively identical to DCRPC R. 8.4(d), which prohibits "conduct that seriously interferes with the administration of justice...."

duty, accept as final the conclusion on that subject; or

(3) the imposition of the same discipline by the Court would result in grave injustice; or

(4) the misconduct established warrants substantially different discipline in the District of Columbia; or

(5) the misconduct elsewhere does not constitute misconduct in the District of Columbia.

Rule XI, § 11(c)(1)-(5).

■ Relying on Rule XI, section 11(c)(4), the Board in this case concluded that disbarment was not "within the range of sanctions for the particular misconduct committed by Respondent" and that "the difference between the Maryland disbarment and the sanction that would have been imposed if this case had been brought as an original matter in the District of Columbia is substantial."[3] Report at 7 (italics omitted). The Board arrived at its recommended sanction of an eighteen-month suspension after considering the sanctions that this court has imposed for conduct similar to respondent's. The Board characterized the recommended eighteen-month suspension as a "substantial suspension" warranted by respondent's "long course of dishonesty about his professional activities, coupled with his fabrication of documents, including official court-stamps." Report at 16.

Respondent urges us to adopt the Board's recommendation. Before the Board, Bar Counsel recommended the identical reciprocal discipline of disbarment, but now takes the position that, while disbarment or a lengthier period of suspension is warranted, the court should impose a suspension of "at least eighteen months." In addition, Bar Counsel urges us to impose a "fitness requirement," *i.e.*, a requirement that respondent demonstrate his fitness to practice law before he may be reinstated in this jurisdiction.[4]

## II. The Recommended Eighteen-Month Suspension

In determining what discipline to impose, this court must consider three issues: whether the Board has supported its determination that there was clear and convincing evidence to overcome the presumption in favor of identical reciprocal discipline; whether the Board's recommended sanction of suspension for eighteen months is consistent with our case law; and whether the Board's recommendation that we not impose a fitness requirement was proper. *See In re De-Maio*, 893 A.2d 583, 586 (D.C.2006).

■ As we observed in *In re Pennington*, 921 A.2d 135 (D.C.2007), there is "what amounts to a presumption under Maryland law that an attorney who en-

---

**3.** As the Board recognized, determining whether the "substantially different discipline" provision of Rule XI, § 11(c)(4) warrants greater or lesser discipline involves a two-step inquiry. First, "we determine if the misconduct in question would not have resulted in the same punishment here as it did in the disciplining jurisdiction." *In re Garner*, 576 A.2d 1356, 1357 (D.C.1990) (citations omitted). " 'Same punishment' is defined as a sanction within the range of sanctions that would be imposed [by our jurisdiction] for the same misconduct." *In re Jacoby*, 945 A.2d 1193, 1200 (D.C.2008). Second, if the disci-

pline imposed in this jurisdiction would be different from that of the original disciplining court, we must then decide whether the difference is "substantial." *Garner*, 576 A.2d at 1357.

**4.** *See* D.C. Bar R. XI, § 3(a)(2) ("Any order of suspension may include a requirement that the attorney furnish proof of rehabilitation as a condition of reinstatement. In the absence of such a requirement, the attorney may resume practice at the end of the period of suspension").

gages in intentional dishonesty will be disbarred." *Id.* at 140. By contrast, in this jurisdiction, "a presumption of disbarment rebuttable only by 'compelling extenuating circumstances' has heretofore been reserved for one class of intentionally dishonest conduct, that involving misappropriation of client funds." *Id.* at 141.[5] Since respondent's conduct did not involve misappropriation, we can begin by agreeing with the Board that had respondent's misconduct occurred in this jurisdiction, it would not have resulted in the same punishment (disbarment) as was imposed in the disciplining jurisdiction.

Thus, it was appropriate for the Board to go on to consider what sanction would likely have been imposed as original discipline in this jurisdiction and whether that sanction is substantially different from disbarment. To make that determination, the Board considered a number of disciplinary decisions of this court in which we sanctioned attorneys for conduct involving fabrication of documents or other dishonesty and (in some of the cases) conduct prejudicial to the administration of justice. The Board referred specifically to *In re Scanio*, 919 A.2d 1137 (D.C.2007) (per curiam) (30–day suspension where attorney made false statements to his personal insurer and lied to his law firm to cover up the original false statements); *In re Hawn*, 917 A.2d 693 (D.C.2007) (30–day suspension where attorney falsified his resume submitted to prospective employers and altered his law school transcript); *In re Owens*, 806 A.2d 1230 (D.C.2002) (30–day suspension where attorney made false statements under oath to an administrative law judge to cover up her attempt to eavesdrop on testimony in violation of a sequestration order); *In re Miller*, 553 A.2d 201 (D.C.1989) (30–day suspension where attorney surreptitiously searched locked files of her former employer to find her personnel information); *In re Zeiger*, 692 A.2d 1351 (D.C.1997) (60–day suspension of attorney who submitted altered client medical records to opposing party's insurer); *In re Schneider*, 553 A.2d 206 (D.C. 1989) (60–day suspension where attorney submitted falsified documents to his law firm to obtain reimbursement for expenses that he had properly incurred but had failed to document); *In re Mendoza*, 885 A.2d 317 (D.C.2005) (90–day suspension of attorney who furnished bogus Criminal Justice Act vouchers to a factoring company); *In re Kennedy*, 542 A.2d 1225 (D.C. 1988) (90–day suspension where attorney diverted client payments that should have gone to his law firm, misrepresented his salary on a personal loan application form, and engaged in the unauthorized practice of law); *Pennington*, *supra*, 921 A.2d at 136–38 (two-year suspension with fitness requirement for attorney who falsely told client that case had been settled for $10,000, which she paid to client with personal funds rather than admit that suit had been dismissed because of her error, facts that led to the attorney's disbarment by Maryland); and *In re Slaughter*, 929 A.2d 433 (D.C.2007) (three-year suspension and fitness requirement where attorney falsely represented to his law firm that the firm

---

**5.** *See also In re Pelkey*, 962 A.2d 268, 281 (D.C.2008) (explaining that this court has ordered disbarment in two types of dishonesty cases: "(1) intentional or reckless misappropriation ... and (2) dishonesty of the flagrant kind," including cases involving "criminal conduct and extremely serious acts of dishonesty" and cases "in which the attorney was in a position of trust" and "took fiduciary funds

for his own personal use") (internal quotation marks omitted). As the Board recognized, "except in cases of reckless or intentional misappropriation, [this court] takes a fact-specific approach in determining sanctions for misconduct, requiring [consideration of a] Respondent's particular misconduct, and not simply the rules that he violated." Report at 6.

had been retained by the State of Arkansas, forged a contingency fee agreement, created phony signature pages and certificates of service, induced the firm to represent certain individual plaintiffs that the firm would not have represented but for the purported representation of the state, and caused the firm to invest over $1.5

million in attorney time and expenses in representing individuals).[6] Report at 11–13. Thus, the Board cited cases evidencing that the sanctions this court has imposed for conduct similar to respondent's conduct in issue here range from a suspension of thirty days to a suspension of three years.[7] On this basis, the Board conclud-

6. The Board opined that *Slaughter* is "the case that most closely resembles this one." Report at 10.

7. The Board might also have cited a number of other cases that involve sanctions within the same range, to which the parties' briefs and cases cited therein direct our attention. *See, e.g., In re Phillips*, 705 A.2d 690, 691 (D.C.1998) (per curiam) (60–day suspension where attorney "filed a false and misleading petition in federal court in a drug-money forfeiture case involving a former client," leading to a conviction of criminal contempt); *In re Outlaw*, 917 A.2d 684, 688–89 (D.C.2007) (60–day suspension where attorney failed promptly to inform her client that the statute of limitations barred her claim, and, "over an extended period of time," "deliberately avoided disclosing the true posture of the case"); *In re Reback*, 513 A.2d 226, 231 (D.C.1986) (six-month suspension where attorneys failed to tell their client that her case had been dismissed in order to conceal their own neglect, and falsely signed, notarized, and filed pleadings); *In re Lopes*, 770 A.2d 561 (D.C. 2001) (six-month suspension where attorney repeatedly forged clients' signatures on affidavits and pleadings, failed to keep clients informed, and neglected client matters); *In re Hutchinson*, 534 A.2d 919 (D.C.1987) (en banc) (one-year suspension for lying to a federal agent under oath and then altering documents to cover up the crime); *In re Belardi*, 891 A.2d 224 (D.C.2006) (per curiam) (one-year suspension where respondent pled guilty to three counts of making false statements to a government agency); *In re Bowser*, 771 A.2d 1002, 1003–04 (D.C.2001) (per curiam) (one-year suspension for making false statements to the Immigration and Naturalization Service in connection with representation of a client applying to become a naturalized citizen); *In re Cerroni*, 683 A.2d 150 (D.C.1996) (per curiam) (one-year suspension for making a false statement to federal agencies in connection with a real estate transaction); *In re McBride*, 642 A.2d 1270, 1272 (D.C.1994) (per

curiam) (one-year suspension where attorney assisted a friend in fraudulently inducing the issuance of a United States passport); *In re Mayers*, 943 A.2d 1170 (D.C.2008) (per curiam) (eighteen-month suspension for submitting altered checks to D.C. Superior Court and overstating the amount of payments made to the court registry); *In re Lenoir*, 585 A.2d 771 (D.C.1991) (per curiam) (eighteen-month suspension where attorney signed another attorney's name to a brief submitted to court, neglected client accounts, and misled a client about the status of her case); *In re Parshall*, 878 A.2d 1253 (D.C.2005) (per curiam) (eighteen-month suspension where attorney misled a U.S. district court by filing a false status report, with attached documents he had fabricated to support the fraudulent report); *DeMaio, supra*, 893 A.2d at 583 (eighteen-month suspension and fitness requirement as a result of respondent's having made "false, spurious and inflammatory representations and allegations" in various filings before the Maryland courts and based on "the content of his various filings in this court"); *In re Alexander*, 496 A.2d 244 (D.C. 1985) (per curiam) (two-year suspension of attorney for directing a member of his office staff to sign the name of opposing counsel on request for continuance and for a pattern of failure to seek client's lawful objectives); *In re Sheehy*, 454 A.2d 1360 (D.C.1983) (en banc) (two-year suspension of attorney for several acts of dishonesty, including misrepresentations to his client, intentionally misstating facts of case in a letter to Bar Counsel, and neglect of client's legal matter); *In re Perrin*, 663 A.2d 517, 518 n. 1 (D.C.1995) (three-year suspension where attorney supervised the preparation of private placement memoranda that contained misrepresentations and omitted material facts, leading to misdemeanor conviction).

ed, and we agree, that there is a substantial difference between disbarment (the sanction imposed by the Maryland Court) and the discipline that this court would have imposed on respondent in an original proceeding. *See DeMaio, supra,* 893 A.2d at 589 ("[I]t is self-evident that there is a substantial difference between [the sanctions imposed in these similar cases] and disbarment. Thus, D.C. Bar R. XI, § 11(c)(4) has been satisfied.").

■ Because the presumption in favor of identical reciprocal discipline is overcome, we next consider whether to accept the Board's recommendation that we impose a suspension of eighteen months as non-identical reciprocal discipline. In determining an appropriate sanction within the range described above, the Board identified several relevant factors. The Board observed that respondent's conduct "did not involve criminal activity;" that "[n]othing in the record suggests that the law firm was defrauded," that respondent "acted for pecuniary gain or was otherwise self-interested," or that he "acted to cover up a mistake;" that respondent's misstatements were confined to the law firm; that respondent self-reported his Maryland disbarment (albeit almost four months after the Maryland Court issued its order);[8] that he had no prior disciplinary history; that he had acknowledged that his conduct warrants a suspension; and that "the client was not deceived in any way, nor were his legal rights affected because he had instructed Respondent that he did not wish to appeal the award of summary judgment."[9] Report at 11, 13, 14, 15, 16. Counterbalancing these factors (which in the Board's view weighed against recommending a sanction at the high end of the range) are several others that, the Board reasoned, "increase[ ] the seriousness of Respondent's misconduct." Report at 12. The Board found that the "duration and scope of [respondent's] dishonesty counsel in favor of a more substantial sanction" than would be appropriate if a single matter were involved. Report at 13–14. The Board noted that respondent engaged in a "protracted course of dishonesty," which continued for an entire year, which "involved multiple affirmative misrepresentations," and "into which he invested substantial effort"; that he fabricated documents and included on them "bogus court file-stamps"; and that he deprived the client "of the opportunity to decide for himself whether, at reduced fees, he would have chosen to appeal the adverse ruling below," conduct that implicated Rule 1.4 (requiring that an attorney "keep a client reasonably informed about the status of a matter" and "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"). Report at 13, 14. Taking into account these various fac-

---

8. As Bar Counsel notes, respondent did not self-report his Maryland disbarment to Pennsylvania. Respondent explains that he had maintained only inactive status in Pennsylvania for several years and "failed to recognize the necessity of reporting this matter to a jurisdiction in which he is inactive." He asserts that nonetheless he "bears full responsibility for not reporting the debarment...." Respondent's Brief at 2 n. 1.

9. The Board's report makes note that respondent submitted to the Board "an excerpt of a letter from his former supervisor to the Maryland Bar Counsel stating that, when ultimately apprised of the firm's offer and Respondent's failure to relay it, the client stated that 'he was not concerned about the situation because he had not wanted to pursue an appeal under any circumstances.'" Report at 3 n. 3. The Board disregarded this letter, however, reasoning that "we may not consider extra-record information in a reciprocal case." *Id.*

tors, the Board arrived at its recommendation of an eighteen-month suspension (which, we think, can fairly be regarded as a mid-range sanction).

■ Bar Counsel asserts that, if "[w]e were writing on a clean slate," disbarment would be the appropriate sanction. Bar Counsel's brief acknowledges, however, that this court's decision in *Pennington*, in which we declined to impose the identical reciprocal discipline of disbarment, "appears to undermine" that argument. We agree with that assessment. Of particular note, in *Pennington*, we suspended rather than disbarred the attorney even though she had a prior disciplinary history and even though, in the wake of her dishonesty to the client and third parties (in order to conceal her own negligence) and her falsification of a settlement sheet, she failed to express remorse. *See* 921 A.2d at 143 n. 3. Bar Counsel emphasizes that here, respondent's position before the Board was that only a brief (30–day) suspension was warranted, demonstrating, in Bar Counsel's view, that respondent likewise has "failed utterly to appreciate the seriousness of his misconduct." However, because a 30–day suspension is within the range of sanctions

that this court has imposed in cases involving dishonesty,[10] and because respondent states that he is "deeply remorseful for and ashamed of his actions," we cannot say that the record clearly and convincingly supports the conclusion that Bar Counsel urges.[11]

Nor can we agree with Bar Counsel that the Board's recommended sanction is "excessively lenient" in light of cases such as *In re Goffe*, 641 A.2d 458 (D.C.1994), and *In re Corizzi*, 803 A.2d 438 (D.C.2002). In *Goffe*, we disbarred the attorney, explaining that "[w]hat most markedly distinguishes this case from any that we have previously seen is the repeated resort not only to false testimony but to the actual manufacture and use of false documentary evidence in official matters." 641 A.2d at 464. In *Corizzi*, we disbarred an attorney who had counseled his clients to commit perjury "to the virtual destruction of their causes." 803 A.2d at 439. While respondent's misconduct involved placing bogus file stamps on purported pleadings, there is no evidence that he submitted such false documents in official proceedings, presented false testimony, or suborned perjury. Thus, although undeniably serious,[12] his

10. *See, e.g. Scanio*, 919 A.2d 1137; *Hawn*, 917 A.2d 693; *Owens*, 806 A.2d 1230; and *Miller*, 553 A.2d 201.

11. Bar Counsel also faults respondent for "claim[ing] [in his brief to the Board] that he was the victim of an unethical supervising partner." However, neither the Maryland courts, having heard respondent's similar explanation (see pp. 17–18 *infra* ) nor the Board characterized respondent's explanation as a failure to accept responsibility for his actions, and we are not persuaded that such a characterization is appropriate. We do, however, agree with Bar Counsel that respondent's statement in his brief to this court that "no appeal . . . was filed, as instructed by Respondent's client" misses the points (as found by the Maryland hearing court) that the client said that he did not want to appeal the [state court] case "because he did not want to incur

additional fees and expenses" and that respondent "never communicated to the client the firm's subsequent decision to offer him a modified fee arrangement if he chose to pursue an appeal." *Guberman, supra*, 896 A.2d at 339.

12. We reiterate that "[h]onesty is basic to the practice of law," and that lawyers "have a greater duty than ordinary citizens to be scrupulously honest at all times." *Reback, supra*, 513 A.2d at 231. Respondent's conduct not only was dishonest, but was a serious violation of the Rules of Professional Conduct in another way as well. As Bar Counsel argues, as a result of respondent's misconduct, the Virginia court clerk's office had to deal with inquiries insisting that the court's files were incorrect, a situation that "created confusion about the court, its processes, and its filings,

conduct, we are satisfied, does not warrant a sanction as severe as the one we imposed in those cases.[13] We also deem it important that, unlike the misconduct at issue in *Slaughter, Sheehy, Perrin,* and *In re Berger,* 737 A.2d 1033, 1035 (D.C.1999), cases on which Bar Counsel relies, respondent's misconduct did not involve fraud. Respondent Slaughter's dishonesty caused his law firm to invest over $1.5 million in attorney time and expenses that it would otherwise not have incurred.[14] *Slaughter,* 929 A.2d 433. In *Sheehy,* the attorney failed to prepare the client's case, allowed the limitations period to expire, falsely told the client that a settlement had been achieved, and then made a payment to client from personal funds to placate her, withholding a purported fee amount. *See* 454 A.2d 1360. In *Perrin,* the attorney "admitted that he had participated in a scheme [involving misleading private placement memoranda] to obtain money by making 'promises and representations as to the future.'" 663 A.2d at 519. And in *Berger,* the respondent engaged in a series of fraudulent transactions with various insurers on behalf of himself and his firm. *See* 737 A.2d at 1035. Here, by contrast, nothing in the record suggests that the law firm, the client or any third party was defrauded.

We are satisfied with the Board's identification of the relevant facts on this record and with its assessment of how they weigh in determining what sanction is appropriate. We therefore adopt the Board's recommendation that we impose an eighteen-month suspension. In doing so, we recognize both that "'[t]he imposition of sanction in bar discipline cases is not an exact science,' and that we owe respect to the considered judgment of the members of the Board." *In re Cater,* 887 A.2d 1, 17 (D.C.2005) (quoting *In re Austin,* 858 A.2d 969, 975 (D.C.2004) (citation and internal quotation marks omitted)).[15]

## III. Whether to Impose a Fitness Requirement

The remaining issue is whether, as Bar Counsel urges, we should require respondent to prove his fitness to practice as a condition of reinstatement following his eighteen-month suspension. In declining to recommend a fitness requirement, the Board explained that the record in this case is relatively undeveloped "in substantial measure because Maryland's *per se* disbarment rule relieved its Bar Counsel of the need to establish the predicates for a fitness requirement." Report at 15. The Board also found "no evidence that Respondent acted out of self-interest or

---

and was indeed prejudicial to the administration of justice." Bar Counsel also argues that respondent's creation of bogus file stamps on fictitious pleadings would have constituted common law forgery in Maryland or Virginia (and thus criminal conduct in violation of Rule 8.4(b)).

13. As we observed in *In re Pelkey, supra* note 5, "a continuing and pervasive indifference to the obligations of honesty in the judicial system" warrants disbarment while less egregious conduct does not. 962 A.2d at 281 (quoting *Corizzi,* 803 A.2d at 443).

14. As Bar Counsel notes [Brief at 33], in *Slaughter,* we commented that we would have

had "no hesitation in ordering disbarment" but for Bar Counsel's having taken no exception to the Board's recommendation of a lesser sanction. 929 A.2d at 447 n. 9.

15. In addition, as we have noted, while urging that a more severe sanction would be appropriate, Bar Counsel does not outright oppose the Board's recommended sanction of an eighteen-month suspension. "[A]lthough the court is not precluded from imposing a more severe sanction than that proposed by the prosecuting authority, that is and surely should be the exception, not the norm...." *In re Cleaver–Bascombe,* 892 A.2d 396, 412 n. 14 (D.C.2006).

intended to injure his client, and nothing that leads us to predict future misconduct." *Id.* at 15–16.

 "[W]hile the decision to suspend an attorney for misconduct turns largely on the determination of historical facts, the decision to impose a fitness requirement turns on a partly subjective, predictive evaluation of the attorney's character and ability." *Cater, supra,* 887 A.2d at 22. Accordingly, as we recognized in *Cater,* while the "evidence that establishes the predicate violation of professional norms is usually much the same evidence that evokes doubts about the respondent's future fitness to adhere to those norms," nevertheless, "proof of a violation of the Rules that merits even a substantial period of suspension is not necessarily sufficient to justify a fitness

requirement." *Id.* What may "tip[ ] the balance in favor of" a fitness requirement is "evidence of circumstances surrounding and contributing to the misconduct." *Id.* One such circumstance is an attorney's lack of remorse, failure to cooperate during the disciplinary process, or other evidence of questionable conduct in the course of disciplinary proceedings.[16] Another circumstance that warrants imposing a condition on the resumption or continuation of practice is repeated neglect of client matters or a repeat of misconduct of the type for which a respondent was previously disciplined.[17] In addition, as our cases explain, where there is evidence that a respondent's misconduct is attributable to unresolved personal problems, we are more likely to conclude that a fitness requirement is warranted.[18] By contrast,

**16.** *See, e.g., In re Lea,* 969 A.2d 881, 890 (D.C.2009) ("[A]n attorney's disregard for the disciplinary process may be so repeated, deliberate, and prolonged that a requirement to prove fitness is entirely justified") (citation omitted); *In re Ukwu,* 926 A.2d 1106, 1119 (D.C.2007) (imposing a two-year suspension and a fitness requirement where attorney, who had "pervasive[ly] neglect[ed]" client matters, caused a letter to be sent to the INS falsely representing that a client was employed, and gave untruthful testimony before a Hearing Committee); *Pennington,* 921 A.2d at 143 n. 3 (explaining that the sanction of suspension with a fitness requirement was warranted because Pennington had "not express[ed] remorse for her deceitful actions" and because she had been disciplined once before); *DeMaio,* 893 A.2d at 589 (noting, in imposing eighteen-month suspension with fitness requirement, that the bizarre and erratic behavior that respondent demonstrated in the Maryland courts continued in his various filings in this court, providing "ample reason to have serious doubt about respondent's fitness to practice law"); *Cater,* 887 A.2d at 26 (imposing fitness requirement and citing attorney's lack of cooperation with disciplinary proceedings and "the three cases in which respondent has failed to respond to Bar Counsel's inquiries"); *In re Chisholm,* 679 A.2d 495, 505 (D.C.1996) (citing attorney's "refusal

to accept responsibility for his actions" and his "lack of contrition" as reasons for requiring him to demonstrate his fitness to practice as a precondition to reinstatement should he violate terms of probation and restitution order); *In re Fogel,* 422 A.2d 966 (D.C.1980) (ordering suspension with fitness requirement where attorney, who had a record of prior discipline, lied to his client, the Hearing Committee and the court); *In re Haupt,* 422 A.2d 768 (D.C.1980) (per curiam) (suspension with fitness requirement for instances of neglect and misrepresentation by attorney who previously had been suspended for 30 days and had received a formal admonition).

**17.** *See, e.g., In re Evans,* 902 A.2d 56, 77–78 (D.C.2006) (requiring that respondent work with a practice monitor because "there is a strong potential that Respondent, who has demonstrated a serious inattention to the details of his practice, could find himself in a similar situation in the future. Respondent has been sanctioned and suspended for misconduct of a similar character, albeit resulting in different violations, in the past").

**18.** *See, e.g., In re Steele,* 630 A.2d 196 (D.C. 1993) (imposing a fitness requirement in large part based on respondent's acknowledgment of unidentified personal problems that adversely affected her emotional stability); *see*

where the misconduct involved a response to the "pressure of the moment"[19] or a situation unlikely to be repeated,[20] we are less likely to impose a condition on the respondent's resumption of practice.

The Board termed respondent's conduct in issue here "bizarre," but concluded that "the record does not shed any light on Respondent's thought process or motivation." Report at 14. What the Maryland hearing court transcript does reveal is the following explanation by respondent:

> I told [the client] that what my instructions were that we would not take the appeal on any type of contingency matter. We would only do it as a strictly hourly billing. He said [that] to him that was an indication that we didn't really have a lot of confidence that we could prevail on appeal, so he wasn't inclined to authorize an appeal. And in addition, he had recently begun working for a new outfit ... And so he had kind of already made the decision himself, that he had moved on. He got, you know, all the money that he had lost through the insurance and he had moved on and he told me that he wasn't interested in any appeal....
>
> Mr. Cooper told me to call him back and tell him we'll do it on contingency. Tell him we'll do it on contingency, you know, and that's that. We're going to take the case to, you know, we're going to appeal.... [H]e's not one to take a client's word as a final matter on something....
>
> [W]orking under Mr. Cooper for four years, I know that he doesn't take "no" as easily as other people will. And in you know, being felt cornered I suppose or in a fit of stupidity I told him that we did file the appeal. I think, at the time, I felt that that was a way to get him off my back and not have to suffer any wrath or further rebukes from him, and we can proceed.

Transcript of hearing before the Circuit Court for Montgomery County, Maryland in Petition No. 19617M, October 24, 2005, at 10, 11, 16.

■■■ Bar Counsel refers to respondent's explanation (and to respondent's statement in his submission to the Board that Mr. Cooper is no longer with the law firm) as respondent's "false exculpatory view of his own misconduct." Because the Maryland Court made no such finding (and, indeed, neither characterized nor even specifically mentioned respondent's explanation quoted above), we decline to draw that conclusion. However, we regard respondent's proffered explanation as consistent with the impression that we take from the record as a whole, which is that the conduct began with what respondent acknowledges was a "foolish and imprudent" response to a particular pressure, and developed into misconduct that snowballed as respondent made effort af-

---

*also In re Cooper,* 613 A.2d 938, 940 (D.C. 1992) (imposing a fitness requirement on account of attorney's unresolved cocaine addiction even though the misconduct for which he was suspended was not attributable to his addiction).

19. *Goffe,* 641 A.2d at 465 (disbarring respondent—and thus requiring a demonstration of fitness before he might resume practice after five years—because he "did not engage in bad acts out of sympathy for another or because of the pressure of the moment;" rather, "his conduct was part of a plan to commit fraud intended to benefit himself"); *McBride,* 642 A.2d at 1273–75 (declining to impose a fitness requirement where attorney, who assisted a friend in fraudulently inducing the issuance of a U.S. passport, "let his heart carry his head").

20. *See Evans,* 902 A.2d at 77 (distinguishing cases that "involved unique situations that were not susceptible to repetition").

ter effort to conceal his initial lie to his supervisor about having filed an appeal on behalf of the client. At all stages, the misconduct was serious, and, concededly, we cannot be certain that respondent will not engage in similar dishonest conduct upon a return to practice, but nothing in the record give us reason to think that misconduct of the type involved here will be repeated.

Bar Counsel takes a contrary view, arguing that "the fact that Respondent was willing to engage in such an elaborate and long-lasting scam ... for no reason that makes any sense increases, rather than decreases the danger he presents to the consumers of legal services, the court, and the integrity of the Bar. One can only wonder at the extent of the dishonest actions Respondent would be willing to undertake to extricate himself from a truly difficult situation." Bar Counsel's brief contends in addition that "[w]ithout an understanding as to what caused respondent, for no reason that makes any sense, to engage in such a prolonged and serious course of misconduct, ... the Court can have no confidence that Respondent will not engage in similar conduct in the future." But this argument comes uncomfortably close to placing on respondent the burden to show that his behavior does not necessitate a fitness requirement, contrary to our cases.

 As we explained in *Cater*, "[w]e are 'reluctant' to impose [a fitness requirement] if the need is not amply demonstrated...." 887 A.2d at 23 (citation omitted). In order for us to require proof of fitness as a condition of reinstatement after suspension, "the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to

practice law." *DeMaio*, 893 A.2d at 589 (quoting *Cater*, 887 A.2d at 24 (explaining also that the burden of proof is on the proponent of the fitness requirement to show by clear and convincing evidence contained in the record of the disciplinary proceeding that "serious doubt" exists as to the attorney's continuing fitness to practice law)). "Serious doubt," we said in *Cater*, is "real skepticism, not just a lack of certainty." 887 A.2d at 24 (internal quotation marks omitted). Thus, the "serious doubt" that *Cater* requires for imposition of a fitness requirement must involve more than "no confidence that [a] Respondent will not engage in similar conduct in the future." We agree with the Board that nothing in the record provides "clear and convincing evidence that casts substantial [or serious] doubt on Respondent's continuing fitness to practice law." Report at 16.

Although acknowledging that in *DeMaio* this court "assumed ... without specifically addressing the issue" that the standard for the imposition of a fitness requirement set forth in *Cater* is "applicable to reciprocal cases in which the Court decides pursuant to D.C. Bar Rule XI, § 11(c)(4), to impose a lesser sanction," Bar Counsel urges us to hold that the *Cater* standard does not apply in such reciprocal proceedings. Rather, Bar Counsel urges, "the Court should be loath to impose a non-identical sanction *not* involving a fitness requirement unless the record clearly establishes that a fitness requirement is unwarranted" and "the burden *ought* to be on the *attorney* to establish that a fitness requirement is *not* warranted." However, having determined not to impose reciprocal discipline identical to that ordered by Maryland, we discern no reason why we should employ a presumption in favor of a fitness requirement such as is entailed in

disbarment.[21] Rather, we confirm, the *Cater* standard does apply in reciprocal discipline cases.

■ We observed in *Cater* that the length of a suspension is fixed, in part, "with the aim of individual correction," such that "[t]he more unlikely it is that the attorney will be rehabilitated by the end of the predetermined suspension term, the more the need for additional protection" in the form of a fitness requirement. 887 A.2d at 23. Here, respondent has already been suspended since October 3, 2006, *i.e.*, for thirty-four months, almost twice the period of suspension recommended by the Board. This, too, weighs against the imposition of a fitness requirement,[22] which operates as an enhanced sanction.[23] Accordingly, for all the foregoing reasons, we adopt the Board's recommendation that we not impose a fitness requirement.

However, while we have determined not to impose a fitness requirement, we also conclude that this is a case in which it is appropriate to exercise our authority, pursuant to D.C. Rule XI, § 3(b), to "impose any other reasonable condition" of reinstatement. Although Bar Counsel has not

shown by clear and convincing evidence that a substantial question exists as to respondent's fitness to practice law, we do agree with Bar Counsel, largely for the reason discussed in note 11 *supra*, that there is some evidence that respondent may not yet fully appreciate the scope of his obligation to "keep a client informed about the status of a matter" and to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rules of Professional Conduct, R. 1.4(a), (b). We are persuaded that respondent, and the clients he may serve upon reinstatement, will benefit from his attendance at a course on professional responsibility designed to bridge the gap between knowledge of the Rules of Professional Conduct and their application in practice. Accordingly, we shall require respondent *to enroll in and complete a course in professional responsibility for attorneys,* approved by Bar Counsel, within six months after resuming law practice in this jurisdiction. Respondent must provide proof of attendance to Bar Counsel and must certify to Bar Counsel that he has complied with the time limit we have established.

**21.** See *In re Ditton*, 954 A.2d 986, 992 n. 7 (D.C.2008) ("[d]isbarment and a five-year suspension with a fitness requirement have the same practical effect in this jurisdiction, as a disbarred attorney has the right to apply for reinstatement after five years"). Moreover, as we observed in *Ditton*, there is nothing in our rules that "preclude[s][a] pairing of reciprocal and original discipline," *i.e.*, reciprocal discipline based on another jurisdiction's findings of misconduct and a fitness requirement (*vel non*) based on application of the standard we employ in original disciplinary proceedings. 954 A.2d at 992.

**22.** *But see Gonzalez, supra*, 967 A.2d at 660 ("That respondent's interim suspension in the District of Columbia has extended well beyond three months does not mean a fitness requirement would 'result in grave injustice' ").

Bar Counsel invites us to hold that given the new rules regarding reinstatement procedures that became effective August 1, 2008, "there is no reason to believe that any petition by respondent for reinstatement would be unduly delayed...." We do not yet have sufficient experience with the amended Rule XI to surmise how long a proof-of-fitness reinstatement proceeding typically will require (and, of course, the time involved in any such proceeding will depend heavily on the specific facts of the case). But our point here is that respondent has already been suspended for considerably longer than the eighteen-month period that we have determined is appropriate.

**23.** We have observed that "while a fitness requirement is not quite as severe an enhancement as disbarment, it comes close." *Cater*, 887 A.2d at 25.

Respondent's failure to do so may provide grounds for additional discipline.

### IV. Conclusion

For the foregoing reasons, it is

ORDERED that Mark S. Guberman is hereby suspended from the practice of law in the District of Columbia for a period of eighteen (18) months effective November 17, 2006, when he submitted proof of his compliance with D.C. Bar R. XI, § 14(g). Within six months after his resumption of law practice in the District of Columbia, respondent shall enroll in and complete a continuing legal education course in professional responsibility for attorneys (to be approved by Bar Counsel), and promptly thereafter shall provide certification to this Court, with a copy to the Board and Bar Counsel, that he has complied with this requirement.

*So ordered.*