*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-BG-0690

IN RE KISSINGER N. SIBANDA, RESPONDENT,

A Member of the Bar
of the District of Columbia
(Bar Registration No. 1017426)

On Report and Recommendation
of the Board on Professional Responsibility

(BDN: 23-BD-024; DDN: 2022-D170)

(Argued March 6, 2025                         Decided August 21, 2025)

*Kissinger N. Sibanda*, pro se.

*Theodore (Jack) Metzler*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, *Julia L. Porter*, Deputy Disciplinary Counsel, and *Dru Foster*, Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before EASTERLY, MCLEESE, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: The Board on Professional Responsibility found that Kissinger Sibanda, a member of the D.C. Bar, violated the New York Rules of Professional Conduct after he revealed information learned from a prospective client to third parties, including that prospective client's opposing party in a lawsuit. The

Board recommends that we suspend Sibanda from the practice of law for thirty days in response. The Office of Disciplinary Counsel agrees with that period of suspension but asks that we also impose a fitness requirement on Sibanda, contrary to the Board's recommendation, requiring that Sibanda demonstrate his fitness to practice law before he is reinstated.

We agree with Disciplinary Counsel about the appropriate sanction and suspend Sibanda from the practice of law for thirty days with his reinstatement conditioned upon him showing his fitness to return to the practice of law.

## I. Factual and Procedural Background

*Kissinger Sibanda's representation of Karim Annabi*

Sibanda's representation of Karim Annabi is central to this case. Annabi had posted an advertisement on Craigslist "[l]ooking for a litigation lawyer" to sue New York University, or NYU. Sibanda responded to the ad and Annabi ultimately asked if he would consider taking the case on a contingency basis, meaning that Sibanda would only get paid as a fraction of what Annabi recovered from NYU. Sibanda declined, explaining that he could not take the case on a contingency basis without doing some preliminary assessment of its merits, for which he proposed a $125 flat fee after which he would consider working on a contingency basis if Annabi's case

was sufficiently strong.  Sibanda explained that the $125 fee was discounted from his usual $200 rate, and he explained that he was willing to offer Annabi the discount in light of their shared African heritage—Annabi is from Algeria, and Sibanda from South Africa.  Annabi agreed to the upfront fee but declined the discount and paid the full $200 for the initial consultation.

Sibanda and Annabi then met over Zoom for the initial consultation and discussed Annabi's case.  After the call, Sibanda emailed Annabi that all "correspondence is confidential" and anything Annabi shared would be "protected."  In that same email, he sent Annabi a draft retainer agreement.  Things went south from there.

With those opening pleasantries behind them, the email exchanges between the two men quickly became heated and acrimonious.  Annabi objected to the proposed fee structure and felt that it was inconsistent with what the men had discussed.  While the retainer agreement contemplated a partial contingency fee, as Annabi had requested, it also required Annabi to pay Sibanda an initial retainer and various other fees as the case moved through different stages of litigation.  Annabi accused Sibanda of engaging in a "deceptive . . . bait and switch" by adding those fees to the agreement.  He demanded that Sibanda refund his consultation fee, which Sibanda flatly refused.  The men continued to exchange words over email, and

Sibanda offered Annabi an alternative fee structure and suggested the men settle their differences as "two noble Africans." But the two never reached an agreement and their relationship ended.

Annabi pressed ahead with his suit against NYU, proceeding pro se, without legal representation. A few months later, Annabi also filed a small claims action against Sibanda seeking to recover the $200 he had paid him for the initial consult plus another $800 in damages. Annabi notified Sibanda of this suit by email. Hours later, Sibanda fired back, and copied NYU's attorney on his response:

> Your lawsuit against NYU . . . has fundamental flaws in law and fact—and *I brought that to your attention when I conferenced with you* via zoom.
>
> Bearing that you keep emailing me even though I have started [sic] that the consultation fee of $200 was agreed upon at the time of consultation, I will be forced to bring this issue to the federal judge handling this case as it speaks to your credibility in this lawsuit. There are many inconsistencies with your claim against NYU. . . .
>
> However, *as I stated during our consult*, your legal assertions are mostly frivolous and not based on any established or existing law.

(emphases added). Sibanda and Annabi continued emailing back and forth, trading insults. Sibanda continued copying NYU's counsel on emails to Annabi, including several emails where he accused Annabi of being racist and antisemitic (Sibanda is Black and Jewish).

The next day, Sibanda attempted to formally intervene in Annabi's suit against NYU. Sibanda moved to be added as an interested party and alleged that Annabi falsified his residency to get diversity jurisdiction to bring the suit against NYU in federal court. Sibanda further included commentary about Annabi's lawsuit, including that he believed Annabi's "legal assertions" were "unfounded in law and frivolous." Sibanda wrote:

> . . . the facts in this matter, before this Court (SDNY), and my dispute with Mr. Annabi, share the same nexus of facts and call to question the frivolous nature of Mr. Annabi's lawsuit and current legal assertions. In addition, [NYU's] well-written "motion to dismiss" echoes and sums up my concerns and the warnings I shared with Mr. Annabi *during our consultation* and is relevant to my own defense in Mr. Annabi's purported lawsuit against me.

(emphasis added). The court denied Sibanda's request to intervene and ordered him not to file any more documents in the case because he was not a party. That same month, Annabi reported Sibanda to the D.C. Bar for his unauthorized disclosure of confidential attorney-client communications. Annabi informed Sibanda about his bar complaint, and Sibanda responded—once again copying NYU's counsel—that there were "many exceptions to attorney-client privilege, including fraud and crime."

Several months later, Annabi emailed a draft motion seeking sanctions against Sibanda to both Sibanda and NYU's counsel—the draft was captioned as though it

would be filed in his federal suit against NYU, though he never actually filed it. Sibanda then forwarded Annabi's draft motion directly to the federal judge overseeing Annabi's case against NYU, acknowledging that it was "an unfiled motion" but nonetheless requesting a chance to respond to its "threatening" and "frivolous" allegations. The court, after some initial confusion about whether Annabi was seeking to file the motion, responded by issuing an order reminding Sibanda that he was not allowed to file anything in the case.

The Office of Disciplinary Counsel charged Sibanda with committing three violations of the rules of professional conduct. While Disciplinary Counsel opined that New York's rules were applicable—as the alleged violations were all in connection with a New York proceeding—it observed that the District's own rules were "substantively the same" so that it was immaterial which set of rules applied. The alleged violations under the New York rules were for divulging information learned from a prospective client in violation of Rule 1.18(b), breaches of client confidentiality under Rule 1.6(a), and for engaging in conduct that impedes the administration of justice under Rule 8.4(d).

*The Hearing Committee proceedings and recommendation*

After an evidentiary hearing, an ad hoc Hearing Committee concluded that Sibanda violated only Rule 1.18(b), prohibiting disclosure of information learned

from a prospective client. He did so, the Committee reasoned, in two respects: by (1) revealing to NYU's counsel and the federal court confidential information about the strength of Annabi's case on multiple occasions and (2) accusing Annabi of being racist and antisemitic in emails that NYU's counsel was copied on. The Committee found that Sibanda had not violated New York Rule 1.6(a), regarding breaches of client confidentiality, because Annabi had never in fact become Sibanda's client. The Committee highlighted some differences between the New York and District rules of professional responsibility on this count, noting that if the District's rules applied, Sibanda would have violated our Rule 1.6(a). But under the New York rules, the Committee reasoned that "Annabi was never [Sibanda's] client" so New York Rule 1.6(a) was inapplicable. Still, the Committee opined that whether Sibanda had violated this precise rule was "not significant" and "a technical issue that does not affect the nature or seriousness of the misconduct," given that it found Sibanda's behavior just as troubling regardless of whether Annabi was a formal client or merely a prospective one. Finally, the Committee concluded that Sibanda had not violated New York Rule 8.4(d) because, despite his efforts to intervene in Annabi's federal suit against NYU, and his defiance of a court order in that case, his conduct did not ultimately interfere with the administration of justice.

The Committee recommended that Sibanda be suspended for thirty days with a fitness requirement. The Committee first noted that violating a prospective client's

confidentiality is a very serious matter. While it then recognized that it was unusual to impose a fitness requirement in response to a single rule violation, the Committee explained that Sibanda's behavior throughout the Committee proceedings themselves was troubling and demonstrated the need for a fitness requirement. It highlighted eight distinct ways in which Sibanda routinely violated the rules governing the Committee's proceedings, including by seeking a continuance of the hearing just one day prior to its scheduled date, failing to provide a complete list of the exhibits he sought to admit, and repeatedly failing to seek disciplinary counsel's position on his procedural motions. The Committee also highlighted that Sibanda "failed to recognize that he ha[d] done anything wrong" and painted himself as a victim of Annabi and disciplinary counsel's unfair attacks. In the Committee's estimation, Sibanda often resorted to attacks and accusations to "defend his reputation and pride" when he felt "insulted or wronged." For instance, Sibanda alleged that disciplinary counsel was engaged in "racism of the lowest form," and he repeatedly lobbed similar accusations against Annabi and the Hearing Committee itself. That pattern of baseless attacks led the Committee to conclude that Sibanda would likely "not respect the sanction imposed," making a fitness requirement especially necessary.

*The Board on Professional Responsibility's report and recommendation*

The Board on Professional Responsibility considered the case on the papers, without hearing from Sibanda in person, after Sibanda waived oral argument. The Board agreed with the Committee that the New York Rules of Professional Conduct apply, and that Sibanda violated only Rule 1.18(b) under those rules by revealing information learned from a prospective client. Contrary to the Committee's view, however, the Board reasoned that Sibanda did not violate Rule 1.18(b) when he copied NYU's legal counsel on emails accusing Annabi of racism and antisemitism. But the Board agreed with the Committee that Sibanda had violated that rule when he repeatedly emailed the federal court and NYU's counsel about his assessment that Annabi's case was generally frivolous.

The Board recommended that Sibanda be suspended for thirty days without a fitness requirement. As to the fitness requirement, the Board agreed with the Committee on most points, including that Sibanda (1) committed a serious rule violation, (2) erroneously believed Annabi's "alleged fraud" "justif[ied] his behavior," (3) made "over-the-top, personal criticisms" of disciplinary counsel and the Committee itself, and (4) failed to follow several procedural rules in the Committee's proceedings. Like the Committee, the Board shared "some doubt as to whether [Sibanda] will avoid similar behavior" if he has difficult prospective clients

in the future and expressed concern that Sibanda's "focus on protecting his reputation over respecting his ethical obligations toward prospective clients . . . might lead to similar misconduct in the future."

The Board ultimately concluded, however, that a fitness requirement was not appropriate because Sibanda committed a single rule violation. It also explained that Sibanda's "relatively minor procedural missteps" before the Committee should not weigh heavily against him. As such, the Board believed any concerns about Sibanda's conduct could be addressed through the suspension and continuing legal education, rather than a fitness requirement.

*The proceedings before this court*

Sibanda and disciplinary counsel each took exception to the Board's recommendation before this court and filed briefs advancing their respective positions, summarized further below. We then heard oral argument, which we briefly describe because to a limited extent it informs our view about the appropriate discipline in this case.

During oral arguments, many of the concerns that led the Hearing Committee to recommend a fitness requirement became evident. Sibanda repeatedly insisted at argument that he had done nothing wrong and was merely trying to thwart Annabi's

fraudulent conduct—he in fact acted as a "Good Samaritan" and did only what he was ethically obliged to do, in his telling. When pressed on the point, with one judge asking for a "yes or no" answer to whether Sibanda acknowledged his violations of Rule 1.18(b), Sibanda fired back that it was "not a yes or no" question in his view and admonished the court that "the oral argument is about me presenting my case, it's not about you rephrasing my case." While that general theme of Sibanda taking exception to the court's questions persisted throughout argument, the court permitted him to present his case for more than twenty-five minutes, far more than the fifteen minutes he was allotted for argument and considerably more than the time disciplinary counsel received. *See* D.C. Ct. App. IOP VI(A) (noting that "each side will be allowed 15 minutes for argument" unless otherwise ordered); Calendaring Order, No. 24-BG-690 (Jan. 30, 2025) (providing 15 minutes per side).

Nonetheless, Sibanda filed a letter with the court mere hours after argument to complain that he was "cut-short in mid-sentence" and to explain that "he takes responsibility," though he still declined to acknowledge that he violated any ethical rules or to say what exactly he was taking responsibility for. Within a week, Sibanda filed another letter purporting to identify additional misrepresentations by Annabi in an entirely separate suit and again reiterated that he "take[s] responsibility for his actions, and [would] learn from the situation," without acknowledging that he had violated any particular ethical rules.

## II. Analysis

Sibanda argues that the evidence did not show that he had committed any rule violations, and he further argues that the Board's recommended thirty-day suspension is "overbroad, disparate, unjustified, incomparable[,] and unsupported by the evidential record." Disciplinary counsel counters that Sibanda indeed violated Rule 1.18(b), but in more respects than the Board found. It defends the Hearing Committee's conclusion that Sibanda violated this rule not only when he shared his assessments of the merits of Annabi's case with NYU's counsel, but also when he copied NYU's counsel on emails in which Sibanda accused Annabi of racism and antisemitism. Disciplinary counsel also argues that Sibanda violated New York Rule 8.4(d), contrary to both the Committee's and the Board's reasoning, highlighting Sibanda's disobedience of a court order in the federal case and his repeated attempts to file papers that were hostile to Annabi.

In considering these arguments, this court will "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record" and "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1). "We review legal conclusions de novo." *In re Klayman*, 282 A.3d 584, 593 (D.C. 2022).

We agree with the Hearing Committee and the Board that Sibanda committed at least one serious violation of New York Rule 1.18. We agree with the Board that, based on that violation alone, Sibanda should be suspended from the practice of law for thirty days. Consistent with the Hearing Committee's recommendation, but at odds with the Board's, we conclude that the record contains clear evidence that casts serious doubts on Sibanda's fitness to practice law, so we further impose a fitness requirement. Sibanda's behavior throughout these disciplinary proceedings, including (1) his general unwillingness to acknowledge his serious misconduct, and (2) his persistent and unsupported attacks on those probing his serious ethical violations, strongly counsels in favor of that fitness requirement. We do not consider disciplinary counsel's arguments that Sibanda committed more violations than the Board found because, regardless, it would not affect our bottom-line view that a thirty-day suspension with a fitness requirement is the appropriate sanction here.

## A. The Rule 1.18(b) violation

The parties before us do not dispute that the New York Rules of Professional Conduct apply, so we take that as a conceded point without further scrutiny. *See generally* D.C. R. Pro. Conduct 8.5(b)(1) (D.C.'s choice-of-law provision requires another jurisdiction's rules to be applied when the conduct at issue is "in connection with a matter pending before a tribunal" that "sits" in that jurisdiction.).

The Board's conclusion that Sibanda violated New York Rule 1.18(b) has overwhelming support in the record. Rule 1.18 governs a lawyer's obligations to a prospective client who "consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter." N.Y. Rule 1.18(a). Annabi was at least a prospective client covered by that rule's terms. In relevant part, and subject to certain exceptions discussed in a moment, the Rule states that "[e]ven when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information." *Id.* 1.18(b).

We agree with the Board that Sibanda plainly violated New York Rule 1.18(b) when he revealed information he learned from Annabi's consultation with him to NYU's counsel and the federal court. Sibanda's email to NYU's counsel and his correspondence surrounding his motion to intervene in federal court directly detailed the impressions of Annabi's case that Sibanda had formed as a result of his consultations with him. In his email, Sibanda wrote that he told Annabi during the consultation that his lawsuit was "mostly frivolous" and suffered from "inconsistencies" and "fundamental flaws in law and fact." The next day, when Sibanda filed his motion attempting to intervene, he summarized for the court that NYU's motion to dismiss "echoes and sums up my concerns and the warnings I shared with Mr. Annabi during our consultation." These are clear violations of New York Rule 1.18(b).

But let us pause to explain why Sibanda's violations of Rule 1.18(b) were far more egregious than the garden variety Rule 1.18(b) violation. Sibanda was not some loose-lipped lawyer spilling client secrets over too many drinks to disinterested third parties, which itself would be a clear violation of Rule 1.18(b). He instead repeatedly shared his derisive impressions of Annabi's case with Annabi's immediate adversary, NYU, and did so in a way that was calculated to undermine his prospective client's interests. Sibanda also shared those views with the federal court, placing himself in clear alignment with NYU's position that Annabi's case should be dismissed and effectively urging the federal court to dismiss Annabi's case. His disclosures could have easily been used by NYU as ammunition in a sanctions motion against Annabi for vexatiously filing a suit that he knew to be frivolous, or they might have simply influenced the court's view of the merits (even if only subconsciously). That is a gross violation of the trust that clients place in their attorneys. We think a potent argument can be made that actively working against a client's interests in the manner Sibanda did "demonstrates [an] absence of the basic qualities for membership in [the legal] profession" more so than the typical misappropriation of client funds, for which disbarment is the usual sanction. *In re Addams*, 579 A.2d 190, 193 (D.C. 1990) (en banc).

Sibanda counters that the information he shared with NYU's counsel and the court was not gleaned from any private consultation with Annabi, but instead came

from public filings in the case that anybody could access. That is, Sibanda conceivably could have read the public filings in Annabi's case and the respective addresses in his filings and from those alone formed his opinion that the suit was frivolous and that he was using a false address in his federal suit. This an absurd contention given that Sibanda repeatedly identified Annabi's consultation with him as the source of the information he was relaying in both his email and his motion. In both his emails to NYU's counsel and his motion to the court, Sibanda explicitly said that he had already informed Annabi during their initial consultations that his case was mostly frivolous. For instance, he described NYU's motion to dismiss as "echo[ing] and sum[ming] up [Sibanda's] concerns and the warnings [he] shared with Mr. Annabi during [their] consultation." Also, Sibanda ignores the fact that he surely would not have had any views about the merits of Annabi's case—and would not have been tracking the public filings in it—absent their initial consultation. A lawyer is not free to publicly share their impressions of a client's or a prospective client's case, without authorization, simply because they can trace their views back to publicly filed documents. The fact that Sibanda thinks otherwise gives us further doubts about his fitness to practice law.

Sibanda also argues that his disclosures fit within an exception to Rule 1.18(b), which permits attorneys to divulge prospective client confidences when necessary "to prevent the client from committing a crime" or "fraud." *See*

New York Rule 1.6(b)(2)-(3). That's wrong as well. We will assume for the sake of argument, despite our better judgment, that Sibanda did nothing wrong by tracking Annabi's case and alerting the federal court to what he believed to be Annabi's use of a fraudulent address to establish diversity jurisdiction. Because even if we put those facts aside—and that is the only conceivable fraud that Sibanda has identified—Sibanda divulged much more than his mere allegation that Annabi was using a fraudulent address. He delved into the merits of the case and shared his legal impressions about them and revealed that he told Sibanda of his suit's frivolity, none of which had anything whatsoever to do with the fraud Sibanda perceived. *See* N.Y. Rule 1.6 cmt. 6A (Disclosures of confidential information "should be no greater than the lawyer reasonably believes necessary to prevent the threatened harm or crime.").

Sibanda was simply a scorned lawyer who took an active interest in trying to sink his prospective client's case. There is no exception he can hide behind to save him from the fact that his actions were a gross violation of the standards this court holds attorneys to, and his persistent attempts to justify his actions only further undermine his fitness to practice law. Attorneys have few obligations more sacrosanct than protecting their clients' interests and confidences, and there are few violations of that trust greater than actively and deliberately working against their clients' interests. We consider Sibanda's actions, where he actively and persistently

worked against his prospective client's interests, to be a grave abuse of the position of trust that he holds.

## B. Sanction

We agree with the Board that a thirty-day suspension is appropriate given Sibanda's "retaliatory" motive and continued denial of wrongdoing. *In re Paul*, 292 A.3d 779, 788 (D.C. 2023) (listing factors we consider to determine sanctions, including "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances" (quoting *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013))). As we have suggested, we think the thirty-day suspension here is on the lenient side of what's appropriate, but we will not sua sponte impose a longer suspension than that absent any request to do so.

The thirty-day suspension is consistent with our case law.[1] For example, in *In re Paul*, we suspended an attorney for thirty days after he disclosed a former client's information as he defended against disciplinary complaints she had lodged against him. We explained that those disclosures were overbroad and "unnecessary

---

[1] We look to D.C. law to determine sanctions, even though Sibanda is charged with violating a New York rule. *See In re Tun*, 286 A.3d 538, 543 (D.C. 2022).

to establish a defense to the disciplinary charge against him." 292 A.3d at 781-82 (finding a violation of Rule 1.6(a)). Sibanda's violations here seem categorically worse than that—he was not defending himself against anything in the NYU case, but was on retaliatory offense against Annabi when revealing his information. Although Sibanda insists he had no retaliatory motive, that is at extreme odds with the record evidence, and the Board's and the Hearing Committee's finding that he had such a retaliatory motive is strongly supported by that evidence. Sibanda shared his assessments of Annabi's case with NYU's counsel within hours of learning that Annabi had filed a small claims lawsuit against him, and he regurgitated those views for the federal court in a motion to intervene the following day. That timing bespeaks a reflexive and petty vindictiveness that casts serious doubt on Sibanda's fitness to practice law.

Then there is the question of whether we should further impose a fitness requirement. While that question divided the Hearing Committee and the Board, we agree with the Committee that a fitness requirement is warranted here, and we do not think it is a particularly close call. A fitness requirement conditions a suspended attorney's reinstatement on proof of rehabilitation. Unlike a suspension, a fitness requirement is "forward-looking" and attempts to prevent future misconduct. *In re Yelverton*, 105 A.3d 413, 429 (D.C. 2014). To impose such a requirement, "the record in the disciplinary proceeding must contain clear and convincing evidence

that casts a serious doubt upon the attorney's continuing fitness to practice law." *In re Cater*, 887 A.2d 1, 24 (D.C. 2005); *see also In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985) (detailing several factors that are useful to consider when deciding on a fitness requirement including "(1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law"). "'An attorney's lack of remorse . . . [and] evidence of questionable conduct in the course of disciplinary proceedings' may tip the balance toward imposition of a fitness requirement." *In re Peters*, 149 A.3d 253, 260 (D.C. 2016) (quoting *In re Guberman*, 978 A.2d 200, 211 (D.C. 2009)) (brackets omitted).

While the Board and the Committee expressed opposing views about whether we should impose a fitness requirement, we note that only the Committee had an opportunity to evaluate Sibanda's demeanor and behavior in person. The Committee recommended a fitness requirement because of the seriousness of Sibanda's misconduct, Sibanda's repeated insistence that he was blameless, and, as the Committee explained, Sibanda's position "that any flaw in his conduct should be excused because of Mr. Annabi's conduct." The Committee also pointed to

Sibanda's accusations of racism and unfairness against all of his detractors as evidence of somebody who immediately goes into attack mode when challenged, and who does not appreciate the seriousness of his misconduct. The Board reached its contrary decision on the papers. Though it shared most of the Committee's concerns about Sibanda, the Board ultimately concluded that it did not have "serious doubt[s]" about Sibanda's ability to continue practicing law.

While we generally defer to the Board's recommended sanction, we find ourselves firmly in the Hearing Committee's camp that a fitness requirement should be imposed here. There are two primary reasons for that: (1) Sibanda's actions throughout these disciplinary proceedings and (2) Sibanda's lack of accountability and remorse for the serious violations he has committed. *See In re Peters*, 149 A.3d at 260 (quoting *In re Guberman*, 978 A.2d at 211).

The Committee's findings about Sibanda's actions during Committee proceedings illustrate a concerning pattern that raises serious doubts about his ability to practice law. The Board downplayed those findings, but the Committee, rather than the Board, actually interacted with Sibanda, and our own interactions with Sibanda put the Committee's concerns on full display. *In re Pye*, 57 A.3d 960, 973 (D.C. 2012) (explaining that "deference to the Hearing Committee's factual findings and credibility determinations is especially heightened where the determinations are

based on direct observation of the Respondent"). As the Committee explained, Sibanda's actions during the course of the proceedings demonstrated that he can become incredibly defensive and resort to personal jabs when corrected and is often quick to take offense when he feels challenged. The record is replete with examples of this pattern of behavior, and this court witnessed it first-hand at oral argument and via Sibanda's post-argument filings.

Sibanda has displayed no actual recognition of how serious his ethical lapses were. As we have explained, Sibanda's actions rank among the grossest violations of trust that an attorney can commit, as he actively and vindictively worked against one of his prospective client's interests. And yet, he cannot acknowledge that he did anything wrong beyond his generic claims to "accepting responsibility" for nothing in particular. Even in his filings with this court, Sibanda continues to accuse disciplinary counsel, the Committee, and the Board of being racist and operating in bad faith, rather than taking accountability for his actions. We appreciate that pro se attorneys are walking a knife's edge when defending themselves against disciplinary charges without demonstrating a lack of remorse, and we do not begrudge any attorney for passionately and vociferously defending themselves against disciplinary charges. But in that delicate balance, when an attorney repeatedly displays such a basic misunderstanding of what their ethical duties are and continues to defend the righteousness of their serious misconduct, we cannot

ignore the implications of that for the attorney's fitness to continue practicing law. All things considered, we have serious doubts about Sibanda's continuing fitness to practice law and thus believe that a fitness requirement is necessary and appropriate here.

Accordingly, we hereby suspend Kissinger N. Sibanda from the practice of law for thirty days, with reinstatement conditioned on a showing of fitness. We further direct Sibanda's attention to the requirements of D.C. Bar R. XI, § 14, governing the responsibilities of suspended attorneys.

*So ordered.*